

December 14, 2008

Wanda Hunt, FOIA/PA Chief
Federal Bureau of Prisons
320 First Street. N.W.
Room 738, HOLC Building
Washington, D.C. 20534

Re:  FOIA/PA Request 2009-00272
Via electronic mail to whunt@bop.gov

Ms. Hunt:

We are responding to your letter of November 28, 2008, in which you informed us of the subject FOIA request for a copy of the contract between CCA and the Federal Bureau of Prisons regarding the California City Correctional Center. We responded to a similar request in March of 2007, under the FOIA/PA Number 2006-07394. We have reviewed the responsive documents you provided, and we conclude that our March 2007 response is still applicable as to the types of redactions requested and the basis for those requests.

To summarize, we are renewing our requests for redaction of the following types of information under Exemption (b)(4) to FOIA:

- Fixed unit prices
- Fixed incremental unit prices
- Maximum award fees
- Monthly operating prices and monthly contract payments
- Contractor supplied small business utilization information
- Any other items for which redaction was requested in the March 2007 letter.

A copy of the March 2007 letter is enclosed with this letter for your reference.

Thank you,

*Cole Carter*

Cole Carter
Assistant General Counsel,
Corrections Corporation of America

enc:  Response to FOIA/PA Request 2006-07394 - March 2007
       Example pages from current responsive documents with redactions applied

Exhibit 1
LeeAnn Tufte Declaration
Page 1 of 9



March 2, 2007

Wanda M. Hunt, Chief
FOIA/PA Division
Federal Bureau of Prisons
320 First Street, NW
Room 841, HOLC Building
Washington, DC 20534

RE: FOIA REQUEST 2006-07394
VIA ELECTRONIC MAIL: whunt@bop.gov

Dear Ms. Hunt:

We are writing in response to your letter of February 20, 2007, in which you informed us that Chadd Powell has made a request for "copies of the contract the Federal Bureau of Prisons has with the Corrections Corporations of America regarding the operation and maintenance of the Northeast Ohio Correctional Facility...and the California City Correctional Facility." We appreciate the opportunity we have under federal law and regulation to respond and to object to the release of items found within those contracts where we believe such release would cause us competitive harm. As a point of clarification, our company owns both the facilities described in the request. For this reason, we do not believe that we are obligated to the Bureau of Prisons (BOP) by contract to perform maintenance on either of these facilities and have no contracts that are for that purpose.

Recently, our company responded to a similar request. In this letter, we have identified the same objections as we did in that letter. We also rely on the same fundamental legal bases for our objections.

**Competitive Harm**

CCA contends that release of this information would cause competitive harm to CCA by enabling competitive firms to emulate CCA's successful bid without completing the legal work themselves. In Gulf & Western Industries, Inc. v. U.S., 615 F.2d 527 (D.C. Cir., 1979), the D.C. Appellate Court reiterated National Parks holding that "in order to show the likelihood of substantial competitive harm, it is not necessary to show actual competitive harm. Actual competition and the likelihood of substantial competitive injury is all that need to be shown." In this instance, actual competition is a certainty, given the recent completion of a highly valued federal solicitation of the same services at different locales and the extreme likelihood that future solicitations of the same type will present themselves in the nearest of terms.

Exhibit 1
LeeAnn Tufte Declaration
Page 2 of 9



The BOP must be satisfied that each successful bidder has the sophistication and in-depth knowledge of the all parameters of the business. Given the frequency of bids and re-bids on federal prison privatization projects which will arise in short course, the competitive advantage to others by appropriating CCA's work product is compelling. It is unfair competition for a direct competitor to short cut its development time and expense by appropriating CCA's successful proposal and thus gain an unearned competitive boost from CCA's work product.

CCA is operating in a competitive marketplace with substantial competitors bidding on every new federal private prison project and re-bids of existing contracts. CCA faces meaningful day-to-day competition with businesses offering similar services. Disclosure of this information would provide CCA's competitors with valuable insights into CCA's strengths and weaknesses in its winning bid responses in this section of their submittal.

FOIA Exemption Number Four protects "trade secrets and commercial or financial information obtained from a person that is privileged or confidential." CCA contends that the certain information contained in the proposal is privileged and confidential information. Information other than trade secrets falls within FOIA Exemption 4 if it is "(1) commercial or financial, (2) obtained from a person; and (3) privileged or confidential." Records are considered to be "commercial" if the submitter could have a conceivable commercial interest in them. In this instance the information CCA submitted to the FBOP was in conjunction with a competitive bid.

The requirement that information be obtained from a "person" is satisfied in that a "person" has been held to include a wide variety of entities including corporations. See Allnet Communications Serv., Inc. v. FCC, 800 F.Supp. 984 (D.D.C., 1992). CCA is a registered corporation.

In National Parks & Conversation Ass'n v. Morton, 498 F.2d 765 (DC Cir., 1974), the court established that records are "confidential" within Exemption Four "if disclosure would be likely either (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information is obtained." The second part of the National Parks test, the "competitive harm prong", is met in this case because disclosure would cause substantial competitive injury to CCA. If revealed to the public, competitors will have access to detailed contract activation schedules containing specific time parameters for hiring under the proposed staffing patterns, detailed date lines for completing specific tasks pre-contract award, at contract award, after contract award but prior to the Notice to Proceed and after the Notice to Proceed period. In addition to the fact that these documents directly affect the costing of the bid, these documents are operational plans of a "commercial" nature directly relating to the competitive bidding process. The BOP evaluated these documents and in the Solicitation Process asked for further clarification. Because of the request for clarification, obviously, these documents were important to the



BOP in the evaluation of each company's bid as to which company submitted the most successful Proposal.

To release these documents would put CCA at a competitive disadvantage because our direct competitors would be able to emulate CCA's successful bid. In <u>Orion Research Inc., v. EPA</u>, 615 F.2d 551, (1st Cir., 1980), the court upheld the exemption of documents submitted to the EPA in a technical proposal holding "that fear of disclosure would induce potential bidders to submit proposals that do not include novel ideas. Moreover, disclosure of this and similar successful proposals would enable competing firms to emulate features common to the plans selected." The ideas and plans contained in the CCA documents are of a similar nature to those in <u>Orion</u>.

CCA does not have to prove the effect of the disclosure on potential bidders. The courts have supported the conclusion that the mere existence of competitors substantiates the fact that there is potential competitive harm. In this instance, competitors would be receiving benefits of CCA's detailed activation plans free of charge and effort. Disclosure of this information would enable competitive firms to emulate CCA's successful bid without completing or creating the plans themselves, but taking the benefit of CCA commercial knowledge and experience.

### Types of Information for which Protection Is Requested

The types of information listed below comprise several types. For each type, we have provided our basis for seeking the protection of that type:

### Pricing and Commercial Information

Below we ask for protection of several categories of pricing and commercial information. Pricing categories include monthly and annual operating payments, fixed incremental unit prices, and maximum payment amounts. In brief, and as we have explained at greater length before, the reasoning for these requests lies in the fact that all correctional services payments have the same basic component: *per diem*. The private corrections industry competes for business by offering a scope of work in exchange for a cost per inmate per day. In BOP contracts, this figure is stated in the macro because BOP uses two tiers of compensation: the 85 percent guarantee level and the fixed incremental unit price. As you know, the 85 percent guarantee level represents the cost per inmate per day to the BOP when the facility house 85 percent of its capacity. The fixed incremental price is a *per diem* charged per inmate per day for every inmate over the 85 percent level. Hence, any unit price can be reverse engineered if any other unit price and the number of inmates housed in the facility in question are known. Inmate populations are published by BOP on the BOP website. They are already public information.

Exhibit 1
LeeAnn Tufte Declaration
Page 4 of 9



Any competitor who knows any one price charged by CCA to BOP need only make an algebraic calculation to determine our real prices. Our prices are our most precious business secrets. In the case of federal business, our company has exhausted every resource at its command to develop pricing that suits our federal customers. Pricing strategy and formulae have been painstakingly developed over the decades of our business.

Of particular concern to us are option prices. As a practical matter, like all federal contractors, we recognize that none of our contracts are guaranteed to continue in perpetuity. The revelation of unexercised options would undermine our ability to compete in future procurements by giving our competitors information that would allow them to predict with near certainty the prices we would propose.

This is most keenly feared in the context of contracts like this one, which could be subjected to recompetition. If any one of our several competitors learned of the prices we have offered via option to the BOP as an inducement to renewal, our competitors could easily and knowledgeably inform government actors that they could undercut our proposed prices. Because the government is obligated to consider the opportunity to create cost efficiencies, the government would be strongly induced to rebid the contract, and our company would face the unfortunate disadvantage of competing against entities by whom our pricing is already known.

Our concern in this area is not only our concern; it is also a concern of the courts. In making this request, CCA respectfully offers the reasoning of McDonnell Douglas Corp. v. U.S. Dept. of the Air Force, 375 F.3d 1182 (C.A.D.C. 2004) as an example of a recent case that addressed the particular risk of harm that can arise in the disclosure of option prices. The 2004 McDonnell Douglas court faced the question of whether the release of option price data for future optional renewals of an Air Force contract posed a risk of substantial competitive harm to the aerospace manufacturer.

The court concluded that "release of the option year prices in the present contract would likely cause McDonnell Douglas substantial competitive harm because it would significantly increase the probability McDonnell Douglas's competitors would underbid it in the event the Air Force rebids the contract," Id at 1189. CCA's situation is not unlike that of McDonnell Douglas, and we face substantial risk of harm if you elect to release this data.

In late 2006, the District Court of the District of Columbia published its memorandum opinion in Canadian Commercial Corp. v. Department of Air Force, 442 F.Supp.2d 15 (D.D.C.,2006). In Canadian, the District Court was called upon to resolve a reverse FOIA complaint in which a couple of Air Force vendors asserted, *inter alia*, that option year prices should be exempt from release under FOIA Exemption Four because the release of option year prices would put upon the same competitive harm we seek to avoid here.

Exhibit 1
LeeAnn Tufte Declaration
Page 5 of 9



Judge Bates explained their plight, and the plight of those of us who find ourselves similarly situated:

> It hardly seems unlikely that a competitor might seek to obtain a contract for option-year work by submitting a "more advantageous offer." The Air Force has not argued otherwise, and has failed to provide any evidence to support a finding that such an offer would be extremely unlikely to prompt it to test the market. Indeed, the FAR makes clear that if the Air Force did so, it would absolutely accept "the more advantageous offer.....[The] [d]isclosure of [plaintiffs'] option year prices would likely cause [plaintiffs] substantial competitive harm by informing the bids of its rivals in the event the contract is rebid. Consequently, the option year prices fall within the scope of Exemption 4, and the decision of the Air Force to release them was contrary to law.
>
> Canadian Commercial Corp.

Other commercial information such as staffing patterns, activation plans, quality control plans, and small business subcontracting plans have also been developed only after the investment of great time and expense. Allowing our competitors access to our commercial data will unfairly allow them to shortcut the hard work we have done and compete unfairly against us in the bids that are sure to come in the near future.

**Confidential Information**

As you know, documents of these types frequently contain critical information of at least two confidential types: private financial data and private personal identification data. Private financial data include bank routing numbers, bank accounts, credit reports and taxpayer identification numbers. Personal identification information includes social security numbers of staff, birthdates and birthplaces of company staff and other information that may subject our key personnel to a heightened risk of identity theft. We have attempted to locate and identify each instance of these, but we would welcome your assistance in diligently reviewing any disclosures to protect this information from public eyes.

**Security or Operational Information**

Finally, there is a substantial amount of information that will threaten the safety of the public and our staff if released. For example, our proposals include detailed explanations of how our staff both prepare for and resolve critical incidents such as escapes and disturbances. The BOP's own documents provide great detail as to the makeup of fencing and gates. BOP requirements outline the munitions requirements of facility



armories. Should any of this information become part of the public domain, the security of many institutions—public and private alike—will be threatened.

**Specific Requests for Protection**

Below we list the particular items from each contract file which we have identified as entitled to protection from public disclosure.

**California City Correctional Center**

- Price Data on Modification Logs
- Proposal - Volume I - 2 Section B – Fixed Price Operation and Fixed Incremental Unit Prices
- Proposal - Volume I - 6 Other Documents – Private Identifiers Belonging to Company Personnel, Small Business Subcontracting Plan, Offeror's Operational Estimate
- Proposal - Volume II A General – Descriptions of Security Procedures (Firearms, Count, Contraband, Emergency Procedures, Escape)
- Proposal - Volume II B Technical 2 Activation and Staffing – Activation Schedule, Staffing Plan and Pattern, Job Family Table
- Proposal - Volume II B Technical 2 Physical Plant –Aerial Photography
- Award File - Flap A - Tab 1 - Contract Document – fixed prices, fixed incremental unit prices, maximum award fee, monthly contract payment, award fee, fixed price operation, incremental unit prices, small business subcontracting plans
- Award File - Flap A - Tab 2 – Email and Fax from Connie Tatko containing miscellaneous pricing information
- Mod #04 – total contract price and per day inmate fee
- Mod #11 – maximum fixed incremental unit price
- Mod #12 – fixed price, monthly price, and option prices
- Mod #16 – option pricing
- Mod #16A – monthly operating prices
- Mod #20 – contract total price, monthly payment, previous maximum amount, new maximum amount, previous monthly amount, option pricing
- Mod #29 – monthly operating payment, annual operating payment, fixed incremental unit price, maximum award fee, total modification amount
- Mod #33 – previous annual operating price, new annual operating price, monthly operating prices, ninety-five percent payments, fixed incremental unit prices, updated option pricing schedule, maximum possible award fee impact, maximum fixed incremental unit price impacts, calculations leading to other maximum amounts.
- Mod #34 – previous annual operating price, new annual operating price, monthly operating prices, ninety-five percent payments, fixed incremental unit prices,



updated option pricing schedule, maximum possible award fee impact, maximum fixed incremental unit price impact, calculations leading to other maximum amounts.
- Mod #38 – monthly operating payments, annual operating payment, fixed incremental unit prices, maximum fixed incremental unit price impact, maximum five percent award fee, calculations related to fixed incremental unit price.
- Mod #40 – annual operating prices, monthly operating prices, monthly operating price payment at ninety five percent, fixed incremental unit price, maximum award fee and underlying calculations, maximum possible modification impact, updated option price schedule.
- Mod #41 – annual operating price, ninety five percent monthly operating price, fixed incremental unit price, maximum fixed incremental unit price and underlying calculations, maximum modification amount
- Mod #43 – option pricing and updated option pricing schedule
- Mod #45 - annual operating price, ninety five percent monthly operating price, fixed incremental unit price, maximum fixed incremental unit price and underlying calculations, maximum modification amount
- Mod #54 - annual operating price, ninety five percent monthly operating price, fixed incremental unit price, maximum fixed incremental unit price and underlying calculations, maximum modification amount
- All revisions to the items above as submitted in final proposal revision documents

**Northeast Ohio Correctional Center**

- Proposal - 5- Business Questionnaire – Personally Identifiable Private Information belonging to various CCA Personnel
- Proposal – 6- Subcontracting Plan – Contractor supplied dollar amounts and percentage allocations comprising the CCA subcontracting plan
- Proposal - 7- Operational Estimate – dollar amounts and staff quantities dedicated to operational functions
- Attachment III NEOCC1750USMS-BOP – The staffing pattern within this file should be protected in its entirety.
- Attachment 11 – Org Chart North Fork – This document should not be included as it is not part of the Northeast Ohio Correctional Center contract.
- NEOCC Activation and Staffing – activation schedule and plan; staffing plan and staffing patterns
- Technical Proposal – Descriptions of Security Procedures (Firearms, Count, Contraband, Emergency Procedures, Escape), Quality control plans
- Mod #2- annual operating prices, monthly operating prices, maximum possible award fee impacts, and maximum possible contract amounts, and fixed incremental unit prices. Mod #6- annual operating prices, monthly operating prices, maximum possible award fee impacts, and maximum possible contract amounts, and fixed incremental unit prices, underlying calculations

Exhibit 1
LeeAnn Tufte Declaration
Page 8 of 9



- Mod #10- annual operating prices, monthly operating prices, maximum possible award fee impacts, and maximum possible contract amounts, and fixed incremental unit prices, underlying calculations
- Mod #13- annual operating prices, monthly operating prices, maximum possible award fee impacts, and maximum possible contract amounts, and fixed incremental unit prices, underlying calculations, fixed prices, maximum award fees.
- Interim Report – handwritten total contract value
- Interim Report - Base 1 – handwritten total contract value number
- Tab 2 - Action Obligation, Base and Exercised Options Value, and Base and All Options Value
- Youngstown Modification Log -Balances, New Total Amounts, and Line 2 and Line 6 Amount of Modification Figures.
- NTP Responses - subcontracting plan
- All revisions to the items above as submitted in final proposal revision documents

CCA appreciates the opportunity to seek protection of this information. If we may answer any questions, please do not hesitate to contact us.

Sincerely,

*Cole Carter*

Cole Carter
Assistant General Counsel, Operations

cc:   Bart Ver Hulst, Managing Director, Federal Customer Relations

Exhibit 1
LeeAnn Tufte Declaration
Page 9 of 9