Stephen Raher, pro se
OSB #095625
P.O. Box 15189
Portland, OR 97293
(503) 235-8446, phone
(719) 457-5916, fax

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

**STEPHEN RAHER,**   Case No. CV 09-526-ST

**Plaintiff**

**DECLARATION OF JUDITH GREENE**

v.

**FEDERAL BUREAU OF PRISONS,**

**Defendant.**

I, Judith Greene, hereby declare:

1. I am an independent criminal justice researcher, currently doing business as Justice Strategies. My curriculum vitae is included herein as Exhibit A.

2. I have researched and written on criminal justice policy issues for over thirty years. My past professional activities include working as a research associate for the RAND Corporation, a senior research fellow for the University of Minnesota Law School, a Senior Research Fellow for the Open Society Institute, and director of the State-Centered Program for the Edna McConnell Clark Foundation.

3. I have written numerous articles on criminal justice policy, including articles published in *Rutgers Law Journal*, *Wake Forest Law Review*, *Crime and Delinquency*, *Current Issues in Criminal Justice*, and *Judicature*.

4.  For twelve years, my professional research and writing has included policy analysis of the private prison industry. I have published research on this topic in *The American Prospect*, *Prison Policy News*, *Current Issues in Criminal Justice* and a variety of anthologies.

5.  The per diem rates paid by state and local governments to contract prison operators are often a matter of public record. When conducting research I have, on numerous occasions, personally obtained per diem payment data related to private prison contracts with state or local governments.

6.  The United States' private prison industry is currently dominated by two companies—Corrections Corporation of America and the GEO Group (f.k.a. Wackenhut Corrections Corporation). In recent years these two companies have controlled approximately three-quarters of the privately operated prison and detention beds in the United States.

7.  Although a majority of prison management contracts are issued after a nominally competitive procurement process, this does not necessarily mean that privatized detention is a free and competitive market. Economic theory indicates that government contracting often leads to ologopolistic markets. For example, Professor Elliott D. Sclar has observed that "Most public contracting takes place in markets that range from no competition (monopoly) to minimal competition among very few firms (oligopoly)." Elliott D. Sclar, *You Don't Always Get What You Pay for: The Economics of Privatization* (2000), at 69 (excerpt included herein as Exhibit B).

8.  Professor Sclar illustrates the problem of oligopolies in government contracting by discussing the defense contracting industry. *See* Ex. B, at 2. This illustration is analogous to the Bureau of Prisons' "Criminal Alien Requirement" ("CAR") series of contracts for two reasons. First, as with defense contracts, the CAR system is a market with only one buyer—the

U.S. government. Second, the market is dominated by a handful of large firms who control a majority of the market. Indeed, Professor Sclar acknowledges this analogy by using Wackenhut Corrections Corporation (n.k.a. the GEO Group) as another ologoplistic case study:

> Often the very act of creating a public-contracting process sets anticompetitive forces in motion. What begins as apparent competition quickly transforms itself by the second or third round of contracting into monopoly or, more typically, oligopoly.
>
> Wall Street is well aware of this dynamic quality of public contracting, even though privatization advocates often choose to ignore it. Recent market analyses prepared by investment bankers to promote shares in the Wackenhut Correctional Corporation, the second-largest contractor in the new for-profit prison industry, made precisely this point. Reports pointed out that there are "effective barriers to entry for smaller competitors, thus helping the industry leaders grow their market share." Furthermore, "as the private correctional industry consolidates there will be fewer players competing for market share."

Ex. B, at 2.

9. My research, including interviews with correctional professionals, has led me to believe that the Bureau of Prisons' management of the CAR system does not create a competitive market because there are high barriers to entry, a handful of companies dominate the market, and contracts are often awarded based on factors other than price and/or a strong history of operational experience.

I declare under penalty of perjury that the foregoing is correct.

*Judith Greene*
Judith Greene

Date: April 14, 2010

**Page 3 – Declaration of Judith Greene**

**JUDITH GREENE**
**JUSTICE STRATEGIES: A Project of the Tides Center**
139 Washington Avenue
Brooklyn, NY 11205
718-857-3316

**PROFESSIONAL EXPERIENCE**

2000-present:   **JUSTICE STRATEGIES,** Justice Policy Analyst and Co-Founder.

      I conduct research and policy analysis on criminal sentencing issues, correctional policies and practices, public opinion on crime and justice issues, immigrant detention issues and policies. My current research activities include analysis of opportunities for sentencing and correctional policy reform in Connecticut, Wisconsin, and Alabama, as well as opportunities for national policy reform on a variety of issues, including mandatory minimum drug laws, mandatory detention and removal of immigrants convicted of crime, and youth gangs. I am a research associate of the Women's Prison Association and the Justice Policy Institute.

1999-2000:   **OPEN SOCIETY INSTITUTE,** Senior Soros Justice Fellow

      Conducted research on prison privatization. Research activities include compiling case studies on the impact of privatization in a number of key states: Minnesota, North Carolina, Tennessee, and Texas. The fellowship project produced a number of publications: magazine and journal articles, "op-eds," as well as widely circulated policy briefs for state officials, human rights advocates, community and labor organizers regarding the impact of privatization on state and local correctional policies, communities, prisoners, and their families.

1997 – 2001:   **RAND CORPORATION,** Research Consultant

      Conducted research and drafts reports for a number of research projects, including the national evaluation of the impact of the Violent Offender Incarceration and Truth-in-Sentencing (VOI/TIS) provisions of the 1994 Federal Crime Act, and . Research activities involved tracing historical developments resulting in "get tough" legislation; and conducting case studies of the impact of privatization on correctional management issues in Florida, North Carolina, and Texas.

1996 - 1999:   **INSTITUTE ON CRIMINAL JUSTICE/UNIVERSITY OF MINNESOTA LAW SCHOOL,** Senior Fellow

      Developed and conducted research and technical assistance projects for the Institute on Criminal Justice. Her research activities include directing a multi-disciplinary team study of prison privatization sponsored by the Minnesota Department of Corrections;

1

and research on attitudes toward restorative justice among criminal justice practitioners in Vermont. Technical assistance activities include design and management of semi-annual workshops on sentencing and correctional issues for state-level criminal justice officials from states that participate in the ICJ's State Partnership for Criminal Justice program.

1993 - 1996: **VERA INSTITUTE OF JUSTICE**, Director of the State Centered Program of the Edna McConnell Clark Foundation

Responsible for planning, development, and management of the Foundation's state-centered reform effort which offered technical assistance to states which were making efforts to reform sentencing and corrections policies to expand the use of intermediate sanctions and bring rates of prison population growth under control. The program promoted improvements in sentencing practice and correctional systems through efforts to improve the policy process and enhance the capacity state-level officials and policymakers to reduce reliance on incarceration and foster development of alternatives to incarceration for appropriate offenders.

1985 - 1993: **VERA INSTITUTE OF JUSTICE**, Director of Court Programs

Responsible for planning and development of demonstration programs designed to improve the efficiency of pretrial release, sentencing practices, and administration of intermediate criminal penalties. These activities included initiation of pilot projects in Staten Island, New York, and Phoenix, Arizona, introducing the European day fine system to American courts, and direction of the technical assistance component of the "Structured Fines National Demonstration Project" for the Bureau of Justice Assistance; responsibility for development of Vera's Community Service Sentencing Project in the New York City Criminal Courts; and both design and management of a three-site demonstration of an innovative intensive supervision program for pretrial releasees.

1986 - 1989: **PROSECUTING ATTORNEYS RESEARCH COUNCIL**, Program Consultant

Assisting prosecuting attorneys with the development of sentencing alternatives in their local jurisdictions.

1982 - 1985: **VERA INSTITUTE OF JUSTICE**, Community Service Sentencing Program Director.

Responsible for management of Manhattan, Brooklyn and Bronx Borough Projects; planned and directed an expansion into the Borough of Queens in 1985.

1981 - 1982: **VERA INSTITUTE OF JUSTICE**, Borough Director, Manhattan Community Service Sentencing Project.

Planned and initiated the Manhattan Borough Project.

1980 - 1981:    **NATIONAL INSTITUTE FOR SENTENCING ALTERNATIVES, BRANDEIS UNIVERSITY**, Director

    Developed and managed a training and technical assistance program designed to foster the use of alternatives to traditional criminal sanctions in local court jurisdictions.

1978 - 1980:    **NATIONAL CENTER FOR YOUTH LAW/YOUTH LAW CENTER**, Research Associate/Planner

    Analyzed public policy and advocated legislative reforms to improve the legal rights of poor and minority youth. Primary concentration in juvenile justice and youth employment rights. Designed and implemented an evaluation component for a project which entailed litigation and law reform activities in six target states.

1978 - 1979:    **NATIONAL ECONOMIC DEVELOPMENT LAW CENTER**, Training Consultant

    Gave technical assistance to community development organizations in planning CETA services linked to community economic development.

1977 - 1978:    **APPROACH ASSOCIATES**, Research Analyst

    Planned and evaluated programs in criminal justice and substance abuse treatment. Primary concentration in alternatives to incarceration and community corrections; correctional work programs, vocational training, and prison industries.

1977:    **SAN FRANCISCO PHOENIX CORPORATION**, Planning Director

    Responsible for planning and fund raising for a demonstration project providing employment and training services for criminal offenders on parole.

1975 - 1977:    **SAN FRANCISCO SHERIFF'S DEPARTMENT**, Director of Women's Resources

    Planned and developed programs for three women's jail facilities. Designed and implemented a work release program for women prisoners. Developed citation release guidelines for both the Sheriff's Department and the San Francisco Police Department. Conducted field research on the enforcement of the prostitution laws by the police, the courts, and corrections.

1975:    **NORTHEAST COMMUNITY MENTAL HEALTH CENTER**, Vocational Counselor

    Assisted criminal offenders with substance abuse problems.

1974:              **SAN FRANCISCO SHERIFF'S DEPARTMENT**, Deputy Sheriff

Performed duties as a correctional officer assigned to the maximum security women's jail.

1973 - 1974:     **MEHARRY MEDICAL SCHOOL ALCOHOL AND DRUG ABUSE PROGRAM**, Offender Services Coordinator

Developed services for incarcerated offenders with substance abuse problems. Designed and implemented court advocacy unit for alternative sentencing component of a multi-modal drug treatment program. Conducted group counseling for prisoners in state institutions.

1974:              **VANDERBILT UNIVERSITY HOSPITAL**, Substance Abuse Counselor
Conducted group counseling for first offenders in a diversion program.

1971 - 1973:     **THE HOUSE BETWEEN**, Project Coordinator
Developed program services for residential alternative project serving adult and juvenile women offenders. Provided counseling and developed educational and employment resources.

## PUBLICATIONS, MONOGRAPHS, AND REPORTS

"Winds of Change: New Developments in Criminal Justice Politics and Policies in the USA." Paper presented in Berlin at the national conference of DBH Fachverband für Soziale Arbeit, Strafrecht und Kriminalpolitik (the German Association for Social Work, Criminal Law and Crime Policy). September 2009.

"Market Madness: How Neo-Liberal Dogma Has Speeded Growth of the Vast American Gulag." Paper presented at the International Prison Privatization Experience: A Transnational and Transpacific Dialogue, Barbara Jordan Mickey Leland School of Public Affairs Texas Southern University. August 2009

"Positive Trends and Best Practices in Criminal Justice Reform: A National Overview." Report presented at the "Counting the Costs" hearing convened by New Jersey General Assembly Majority Leader Bonnie Watson Coleman on May 6, 2009.

"Local Democracy on ICE: Why state and local governments have no business in federal immigration law enforcement," with Aarti Shahani. New York: Justice Strategies. February 2009.

"Diversion Works: How Connecticut Can Downsize Prisons, Improve Public Safety and Save

4

Money with a Comprehensive Mental Health and Substance Abuse Approach," with Russ Immarigeon. New York: Drug Policy Alliance. April 2008.

"Gang Wars: The Failure of Enforcement Tactics and the Need for Effective Public Safety Strategies," with Kevin Pranis. Washington, DC: Justice Policy Institute. July 2007.

"Banking on the Prison Boom," in *Prison Profiteers: Who Makes a Buck from Mass Incarceration,* eds, Paul Wright and Tara Herival. New York: The New Press. 2007.

"Hard Hit: The Growth in the Imprisonment of Women, 1977-2004," with Natasha Frost and Kevin Pranis New York: Women's Prison Association. May 2006.

"Disparity by Design: How drug-free zone laws impact racial disparity – and fail to protect youth," with Kevin Pranis and Jason Ziedenberg. Washington, DC: Justice Policy Institute. March 2006.

"Treatment Instead of Prisons: A Roadmap for Sentencing and Correctional Policy in Wisconsin," with Kevin Pranis. New York: Justice Strategies. February 2006.

"Alabama Prison Crisis," with Kevin Pranis. New York: Justice Strategies. October 2005.

"Criminal Justice Reforms: Implications for Immigrants' Rights Advocates." New York: Justice Strategies. November 2005.

"From Abu Ghraib to America: Examining Our Harsh Prison Culture." New York: Open Society Institute. October 2004.

"Arizona Prison Crisis: A Call for Smart on Crime Solutions," with Kevin Pranis. Washington, D.C.: Families Against Mandatory Minimums. May 2004.

"Positive Trends in State-Level Sentencing and Corrections Policy." Washington, D.C.: Families Against Mandatory Minimums. November 2003.

"New Jersey sentencing and a call for reform." A Families Against Mandatory Minimums *Smart on Crime briefing book.* Washington, D.C.: FAMM. July 2003

"North Carolina sentencing and a call for reform." A Families Against Mandatory Minimums *Smart on Crime briefing book.* Washington, D.C.: FAMM. March 2003

"Cutting Correctly in Maryland: New Prison Policies for Times of Fiscal Crisis." A Justice Policy Institute Report. Washington, DC: Center for Juvenile and Criminal Justice. February, 2003.

"Bailing Out Private Jails." In *Prison Nation: The Warehousing of America's Poor.* Eds: Tara Herival and Paul Wright. London and New York: Routledge Press. 2003.

"Lack of Correctional Services: The Adverse Effects on Human Rights." In *Capitalist Punishment: Prison Privatization and Human Rights.* Eds. Andrew Coyle, Rodney Neufield and Allison Campbell. Atlanta, GA: Clarity Press. 2003.

"Getting Tough on Crime: the History and Political Context of Sentencing Reform Developments Leading to the Passage of the 1994 Crime Act." In *Sentencing and Society: International Perspectives.* Eds. Cyrus Tata and Neil Hutton. Aldershot, England: Ashgate Press. 2002.

"Cutting Correctly: New Prison Policies for Times of Fiscal Crisis." A Justice Policy Institute Report, co-authored with Vincent Schiraldi. Washington, DC: Center for Juvenile and Criminal Justice. February 2002.

"Entrepreneurial Corrections: Incarceration As A Business Opportunity." In *Invisible Punishment.* Eds. Marc Maurer and Meda Chesney-Lind. New York: The New Press. 2002.

"Changing Prison Management Strategies in Response to VOI/TIS Legislation." A RAND research report for the National Institute of Justice, co-authored with Susan Turner, Laure J. Hickman, and Terry Fain. Santa Monica, CA: RAND. December 2001.

"Bailing Out Private Jails" and "Mississippi Churning." *The American Prospect.* Vol.12, No. 16. September 10, 2001.

"Nice Little Earner." *The Index on Censorship.* Vol. 30, No. 3 Fall, 2001.

*Privatization of Correctional Services: Evaluating the Role of Private Prison Management in Minnesota.* With Steven Belenko, Chuck Davis, Michael Jacobson, and David Schultz. Minneapolis, MN: University of Minnesota Law School Institute on Criminal Justice. At http://www.law.umn.edu/centers/crimjust/sentence.php

"Comparing Private and Public Prison Services and Programs in Minnesota: Findings from Prisoner Interviews." *Current Issues in Criminal Justice*, Vol. II, No. 2. Sydney University School of Law, 1999.

"Zero Tolerance: A Case Study of Police Policies and Practices in New York City." *Crime and Delinquency*, Vol. 45 No. 2, April 1999.

"The Fare Probation Experiment: Implementation and Outcomes of Day Fines for Felony Offenders in Maricopa County." With Susan Turner. *The Justice System Journal*, Vol 21/1, 1999.

EXHIBIT A
PAGE 6 OF 11

"The Unit Fine: Monetary Sanctions Apportioned to Income." *Principled Sentencing: Readings on Theory and Policy,* edited by Andrew von Hirsch and Andrew Ashworth. Oxford: Hart Publishing. 1998.

"Massachusetts, Missouri, and Oklahoma Establish Sentencing Commissions." *Sentencing Reform in Overcrowded Times,* edited by Michael Tonry and Kathleen Hatlestad. New York: Oxford University Press. 1997.

"Controlling Prison Crowding." *Corrections Today,* Vol 59, No. 1, February 1997.

*How to Use Structured Fines (Day Fines) as an Intermediate Sanction.* 1996. Washington DC: Bureau of Justice Assistance. With Barry Mahoney, Julie Eigler, and Joan Green.

"Wisconsin Guidelines Killed, Oregon's Weakened." *Overcrowded Times,* Vol. 7. No. 1, February 1996.

"Phoenix FARE Program Implements Day-Fine System." *Overcrowded Times,* Vol. 6. No. 2, April 1995.

"When Should Reformers Support Creation of Sentencing Guidelines?" *Wake Forest Law Review,* Vol. 28, No. 2, Summer 1993. With Andrew von Hirsch.

"Day Fines: Monetary Sanctions Apportioned to Income." *Principled Sentencing.* 1992. Edited by Andrew von Hirsch and Andrew Ashworth. Boston, Massachusetts: Northeastern University Press.

"The Staten Island Day Fine Experiment." *Day Fines in American Courts: The Staten Island and Milwaukee Experiments.* 1992. Edited by Douglas C. McDonald. Washington, D.C.: National Institute of Justice.

"The Use of Fines as an Intermediate Sanction." *Smart Sentencing: The Emergence of Intermediate Sanctions.* 1992. Edited by James M. Byrne, Arthur J Lurgio, and Joan Petersilia. Newbury Park, California: Sage Publications, Inc. With Sally T. Hillsman.

"Punishments in the Community and the Principles of Desert." *Rutgers Law Journal,* Vol. 20, No. 3, Spring 1989. With Andrew von Hirsch and Martin Wasik.

*Preliminary Report on the Establishment of the Nassau Bail Bond Agency.* 1989. New York: Vera Institute of Justice.

*Preliminary Data Report: Day-Fine Pilot Project.* 1988. New York: Vera Institute of Justice.

"Structuring the Criminal Fine as an Intermediate Penalty: Making Fines a More Useful and More Equitable Sentence." *Justice System Journal,* Vol. 13, No. 1, Spring, 1988.

"Tailoring Criminal Fines to the Financial Means of the Offender." *Judicature,* Vol. 72, No. 1, June-July 1988. With Sally T. Hillsman.

"European `Day Fines' as a Method for Improving the Administration of Monetary Penalties in American Courts." *Perspectives,* Journal of the American Probation and Parole Association, Summer, 1988. With Sally T. Hillsman.

*Improving the Use and Administration of Criminal Fines: A Report of the Richmond County (New York) Day-Fine Planning Project.* 1987. New York: Vera Institute of Justice. With Sally T. Hillsman.

*Suggestions for a Proposed Day Fines Plan for Richmond County.* 1986. New York: Vera Institute of Justice.

*The New York City Community Service Sentencing Program: Interim Report Series.* 1983, 1984, 1985. New York: Vera Institute of Justice.

"Governmental Restraints on the Employment of Sixteen- and Seventeen-year-olds: Vestiges of a Bygone Era." *Clearing-House Review,* Vol. 13, No. 12, April, 1980. With James Morales.

*Youth Employment Advocacy Issues.* 1979. Washington, D. C.: Legal Services Corporation Research Institute. With Deborah Bachrach and Larry Glantz.

*California Legislative Study of Correctional Needs, Volume Four: Work and Vocational Programs.* 1978. Oakland: Approach Associates.

*Master Plan for New Mexico Mental Health Services.* 1978. Oakland: Approach Associates. With Mark Morris, Howard Schecter and others.

*Master Plan for New Mexico Corrections.* 1977. Oakland: Approach Associates, 1977. With Alan Kalmanoff, Mark Morris and others.

*Women Patrol Officers in Newton Massachusetts.* 1977. Oakland: Approach Associates. With Carol Kizziah and others.

*Alternatives to Incarceration in Alaska.* 1977. Oakland: Approach Associates. With Alan Kalmanoff and others.

## PRESENTATIONS AND MEDIA APPERANCES

"Alternatives to Detention: Decarceration or Widening Nets?" Presentation for the Detention Watch Network, Washington, DC. January 2009.

"Gang Interventions: What Works, What Doesn't." Panel presentation at Congressman "Bobby" Scott's Youth Violence Summit. Washington, DC. December 2008.

"Mass Incarceration of Immigrants." Panel Presentation at the NAACP Annual Conference. Cincinnati, Ohio. July 2008.

"Confidential Informants: Foot Soldiers in Mississippi's War on Drugs." Panel presentation for the ACLU Drug Law Reform Project Informant Roundtable. Washington, DC. June 2008.

"The Failed War on Gangs: Is There a Way Out?" Panel presentation for the Open Society Institute Justice Fellows Retreat. San Francisco. June 2008.

"School Zones: Disparity by Design." Panel presentation for "Break the Chains" Annual Conference. Baltimore, MD. June 2008.

"Cracking Connecticut's Crack/Powder Disparity Law." Panel presentation at Rainbow/Push Annual Conference. Chicago, June 2007.

"Prisons for Profit." Interview appearance on PBS Now, broadcast May 5, 2008.

"Not Far Enough: Taking Stock of Progress in the National Reentry Effort." Panel presentation at the Open Society Institute's Reentry Advocates Retreat. November 2006.

"Opportunities and Obstacles to Correctional Reform." Benedict Center Annual Address. Milwaukee, Wisconsin. April 2006.

"The Federal Immigrant Detention Industry." American Bar Association Panel presentation at the National Press Club. Washington, DC February 2006.

"Criminal Justice Reforms: Implications for Immigrants' Rights Advocates." Paper presented at a national convening of criminal justice and immigrant advocates jointly sponsored by the Open Society Institute, the JEHT Foundation, and the Ford Foundation. New York. December 2005.

"Sentencing and Reentry Reforms: Research Findings and Future Prospects." General Session at the National Task Conference in Arlington, Virginia. September 2004.

"Privatization of County Jails: Prospects and Pitfalls," Debate panel at the National Association of Counties Annual Conference. Phoenix, Arizona. July 2004.

"The Abu Ghraib Factor: American Prison Tactics at Home and Abroad." The Books in Berlin Lecture Series. June 2004.

"Secret Detention of Immigrants After 9/11 – The Human Rights Crisis in New York City." Panel presentation at the Second German-American Symposium on Preventing Bias-motivated Violence. Berlin, Germany. June 2004.

"Positive Trends in State Sentencing and Corrections Policy ." Panel moderator at the State Strategies for Criminal Justice Reform conference. Baltimore, Maryland. November 2003.

"Entrepreneurial Corrections: Incarceration as a Business Opportunity." Lecture at Cornell University. Ithaca, New York. November 7, 2002.

"Immigrant Detention and Incarceration: Reform Strategies." Panel moderator at the Detention Watch Conference. Washington, D.C. September 21, 2002.

"Private Police and Private Prisons." Presentation at the Police Associations and Community Conflict seminar for the National Coalition of Public Safety Officers. San Diego, California. September 4, 2002.

"Private Prison Pitfalls." Presentation for Citizens Against Private Prisons. Jackson Hole, Wyoming. July 27, 2002

"Broken Promises: Two Decades of Experience with Prison Privatization in the United States." Panel presentation at a public forum sponsored by the Canadian Centre for Policy Alternatives. Vancouver, Canada. May 29, 2002.

"Prison Privatization: Best Practices; Worst Practices." Lecture at the Campbell Public Affairs Institute, Maxwell School of Citizenship and Public Affairs, Syracuse University. March 7, 2002.

"Cutting Correctly: Corrections Policies for a Time of Fiscal Crisis." Panel presentation for Families Against Mandatory Miniumus. February 22, 2002.

"Debates, Debates." A nationally-syndicated TV broadcast debate on prison privatization in the US. New York, NY. January 2002.

Canadian Broadcasting Company "Counterspin." A live national TV broadcast debate on prison privatization in North America. Toronto, Canada. March 2001.

"The Federal Bail Out of Private Prisons." Presentation at the Corrections and Criminal Justice Coalition annual conference. Orlando, FL. January 2001.

"Getting Tough: A Quarter Century of Sentencing Policy in the U.S." Presentation at the British Columbia Provincial Court Fall Education Seminar. Vancourver, Canada. November 2000.

"Private Prisons for Immigrant Prisoners." Panel presentation at the annual Detention Watch conference. Chevy Chase, MD. November 2000.

"Private Prison Deficiencies and Human Rights Abuses." World Research Group annual conference on Prison Privatization. San Antonio, TX. September 2000.

"Preliminary Findings of a Privatization Study in Minnesota." Panel presentation at the Academy of Criminal Justice Sciences. Orlando, FL. March, 1999.

"Preliminary Findings from the Minnesota Study of Prison Privatization." Presentation and Workshop Moderator for the University of Minnesota Law School Private Prison Workshop. Minneapolis, MN. January, 1999.

"Privatization of Prisons: Critical Issues for State Policymakers." Presentation for the RAND Criminal Justice Program Workshop. Santa Monica, CA. January, 1999.

"Prison Privatization: Punishment for Profit?" Panel moderator for the Campaign for Effective Crime Policy conference. Washington, DC. November, 1998.

"Privatization of Correctional Services: Critical Issues for State Policymakers." Briefing panel presentation for the Center on Crime, Communities and Culture. New York, NY. May, 1998.

"Zero Tolerance Policing in New York City" International Conference on Crime Prevention sponsored by the Friedrich Ebert Stiftung. Berlin, Germany. May 1998.

"Critical Issues in Privatization of Correctional Services." Presentation for the Institute on Criminal Justice, State Partnership Workshop. Phoenix, AZ. October, 1997.

"The Future of Sentencing Policy." Lead panel presentation at the Academy of Criminal Justice Sciences. Louisville, KY. March, 1997.

"Correctional Options in Community Corrections." Presentation for the Maryland Commission on Criminal Sentencing Policy. The Aspen Institute, Maryland. December, 1996.

"Best Practices for Non-Incarcerative Sentencing Options." Presentation for the Maryland Commission on Criminal Sentencing Policy. Great Oaks Center, Maryland. October, 1996.

"Recent Trends in Public Opinion about Crime and Criminal Justice." Workshop for the National Foundation for Women State Legislators. New York, NY. July, 1996.

# 4 What's Competition Got to Do with It?
## Market Structures and Public Contracting

### Competition and Its Constraints

Proponents of privatization often argue that they do not necessarily oppose direct public service—they oppose the waste of money. From their perspective, too many public managers and employees conspire, consciously or unconsciously, to squander taxpayers' money. They successfully do this because public service is insulated from the cost-cutting rigors of the competitive market and suffers from the bureaucratic equivalent of hardening of the arteries; too many public dollars get stuck in the passage between the public treasury and service to citizens. By exposing public services to private-sector discipline and competition, privatization forces public servants to clean up their acts. Either they learn a new ethic of workplace efficiency, or they forfeit their jobs. From this analysis flows the rationale and mantra of privatization: "It's not a matter of public versus private, it's a matter of monopoly versus competition."

Contracting out is seldom so simple because it occurs in a variety of market and public-agency settings that rarely approximate the textbook model of competition. Most public contracting takes place in markets that range from no competition[1] (monopoly) to minimal competition among very few firms (oligopoly). Although oligopoly is preferable to monopoly, it is still far removed from the salutary competition venerated by privatization advocates. In oligopolistic markets, the few sellers are

---

[1] A recent audit of consultant contracts in California found that almost two-thirds of them were let on a sole-source basis (State of California, Office of the State Auditor 1996).

69
EXHIBIT B
PAGE 1 OF 4

well aware of each other's presence. Even when there is no outright collusion, they frequently submit bids with an eye on the anticipated needs of their ostensible "rivals" as well as needs of their own. Oligopolists recognize that their individual long-term best interests are tightly entwined with the collective, long-term interests of the industry. A peaceably divided market promises greater long-term profitability than that provided by any adversarially won short-term gain. The biggest and best case in point is the ongoing saga of abuse of the public treasury that we euphemistically call "defense contracting." Documented cases of bid rigging, price fixing, revolving-door executive employment,[2] and outright corruption among the handful of oligopolistic corporations that control defense spending are enshrined in U.S. folk history with the oft-told tale of the $600 toilet seat.[3]

When responsible public officials contemplate privatization, it is imperative that they understand the true structure of the market that they are entering. The assumption that the market is competitive is incorrect. Indeed, even when a market initially appears to be competitive, policy makers must remain wary. Public-contract markets, like most markets, change quickly and continually. Often, the very act of creating a public-contracting process sets anticompetitive forces in motion. What begins as apparent competition quickly transforms itself by the second or third round of contracting into monopoly or, more typically, oligopoly.

Wall Street is well aware of this dynamic quality of public contracting, even though privatization advocates often choose to ignore it. Recent market analyses prepared by investment bankers to promote shares in the Wackenhut Correctional Corporation, the second-largest contractor in the new for-profit prison industry, made precisely this point. Reports pointed out that there are "effective barriers to entry for smaller competitors, thus helping the industry leaders grow their market share." Furthermore, "as the private correctional industry consolidates there will be fewer players competing for market share" (Prudential Securities 1996; Lazard Freres & Co. LCC 1996). Such market contraction is commonplace in public service contracting.

---

[2]Revolving-door executive employment is the hiring practice by which defense contractors employ outgoing public officials who have awarded contracts to them in the past.

[3]Good descriptions of this oligopolistic boondoggle can be found in Fallows (1981) and Shaller (1991).

EXHIBIT B
PAGE 2 OF 4

R
ol-
ds
·c-
·d
li-
·o-
se
·u-
ig-
ht
·ol
ıle

m-
ey
or-
·e,
ost
ng
m.
he
lly,

ıg,
·nt
in
:or
rts
m-
ur-
be
96;
on-

:on-
:ast.
81)

Consider what happened when the government of Fort Lauderdale, Florida, decided to close its municipal pipe-laying department in the early 1990s. Local officials estimated that in the previous year they had paid about $90 per linear foot when they infrequently used outside contractors and assumed that this figure was less than their in-house cost. As word quickly spread through south Florida that all of the pipe-laying work in Fort Lauderdale was about to be privatized, contractors readied bids ranging up to $130 a linear foot. Meanwhile, city engineers prepared a careful, avoidable-cost analysis in anticipation of the upcoming privatization but were surprised to learn that their in-house cost was actually between $68 and $73 per linear foot. At about the same time, department employees had approached city officials via the municipal labor–management conciliation organization with a credible complaint that even this estimate was too high because the work was poorly organized. When the work was reorganized along lines suggested by the employees, in-house cost dropped to $43 per linear foot. When the outside contractors learned that Fort Lauderdale was having second thoughts about its privatization decision, they lowered their bids to the $50 to $60 range. But, by then it was too late. The department remained public but reorganized.

This example is remarkable for two reasons: (1) It illustrates the power of workplace reorganization to save money; this is perhaps the best way to ensure value for the public dollar but is often overlooked in the rush to privatize. (We explore this option more fully in Chapter 6.) (2) More germane is the market behavior of the local contractors. As with the Massachusetts highway-maintenance example, firms that do heavy construction work often comprise a small, regional, and tight-knit community. Frequently bidding against each other for public work, they are keenly aware of the local economic and political conditions under which they all operate. In such instances, market strength vis-à-vis the public agency, instead of cost, often determines product pricing. Perhaps the true private cost of laying pipe in Fort Lauderdale was $90 and the contractors initially thought the city had tilted the bargaining situation in their favor. Perhaps the subsequent lower bids were loss leaders[4] designed to close down the municipal department. We will never know

---

[4] A loss leader is an item that is priced extremely low so as to entice customers to give sellers more business. Supermarkets frequently employ this "bargain" pricing on staple items such as milk to attract shoppers to make larger purchases at higher prices.

EXHIBIT B
PAGE 3 OF 4

Case 3:09-cv-00526-ST    Document 37    Filed 04/15/10    Page 18 of 18    Page ID#: 628

for sure. We do know, however, that when sellers have an oligopolistic relationship with one another, pricing behavior reflects market strategy more than the actual cost of production.

Because of the key role played by market structure in determining public-sector advantage, it is important to consider both the current state of the market and the dynamics that are shaping its future when assessing the efficacy of privatization. To better understand these dynamics, this chapter presents three case studies of contracting out public services, first in a monopolistic, and then in an oligopolistic, market.

### A Monopoly Market: Fire Fighting in Scottsdale, Arizona

Fire protection often has been cited as an ideal candidate for privatization (Donahue 1989; Osborne and Gaebler 1992; Poole 1980; Savas 1987). It is expensive, sometimes accounting for more than 20 percent of the general funds of a municipality (Osborne and Gaebler 1992, 223). Alternative service-delivery arrangements already exist: not only local volunteer fire departments but also a publicly traded, profit-making corporation, Rural/Metro, that has provided fire protection to Scottsdale, Arizona, since 1948. Nearly every important study advocating or studying the privatization of municipal services refers to Scottsdale, yet few cities have followed its example. Even among those that have, they often drop the practice after a brief experiment because the Scottsdale experience is historically unique. Although it demonstrates that private for-profit fire protection is feasible in the United States, it is an example of a monopoly rather than competitive contracting. Every year, without competitive bidding, Rural/Metro and the City of Scottsdale negotiate a cost-plus-profit contract for fire protection for the next twelve months.

Rural/Metro was founded when Scottsdale was a sparsely populated, unincorporated region beyond the Phoenix city line. After a neighbor's home burned to the ground, Louis Witzeman organized local residents to provide their own voluntary fire protection. But, after Witzeman personally made the down payment on a fire truck, the collective effort dissolved. He completed the purchase and, in a pioneering innovation, created a subscription-supported fire company to recoup his investment. Neighbors were free to subscribe to his newly created "Rural Fire Department." When the City of Scottsdale was incorporated in 1951, rather

EXHIBIT B
PAGE 4 OF 4