**RYAN J. MCLELLAN, OSB # 023908**
Email: rmclellan@smithfreed.com
**JOSEPH A. ROHNER IV, OSB # 064919**
Email: jrohner@smithfreed.com
**SMITH FREED & EBERHARD PC**
111 SW 5th Avenue, Suite 4300
Portland, OR 97204
Tel: 503-227-2424
Fax: 503-227-2535

**ROBERT P. CHARROW,** *admitted pro hac*
Greenberg Traurig, LLP
charrowr@gtlaw.com
2101 L Street N.W., Suite 1000
Washington, DC 20037
Tel: 202-533-2396
Fax: 202-261-0164
**DAVID P. GOODWIN,** *admitted pro hac*
Greenberg Traurig, LLP
goodwind@gtlaw.com
3161 Michelson Drive, Suite 1000
Irvine, CA 92612
Tel: 949-732-6578
Fax: 202-261-0110
  Attorneys for Intervenor Defendant The GEO Group, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **STEPHEN RAHER,** | CV 09-526-ST |
| Plaintiff, | |
| v. | **DECLARATION OF KYLE SCHILLER** |
| **FEDERAL BUREAU OF PRISONS,** | |
| Defendant, | |
| **THE GEO GROUP, INC.,** | |
| Defendant-Intervenor. | |

/ / /

PAGE - 1   Declaration of Kyle Schiller
     *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

I, KYLE SCHILLER, declare as follows:

1. I am the Vice President of Operations/Administration for the GEO Group, Inc., and currently reside in Palm Beach County, Florida. I am over the age of 18 and have full knowledge of the facts contained in this Declaration.

2. I have been employed by The GEO Group, Inc. ("GEO") since May of 1997. In my current capacity as GEO's Vice President of Operations/Administration I collaborate in the development and pricing of proposals submitted to governmental entities and political subdivisions in response to Requests for Proposals (RFPs) and other solicitations. Prior to my current position, I was GEO's Director of Business Management for the Western United States. In that capacity I was also directly involved in the preparation of proposals as well as oversight and responsibility for all GEO facilities within the Western United States. Prior to that position, I was an GEO's Assistant Facility Administrator at the San Diego City Jail in California.

3. Through my work with GEO and industry associations, I know and understand the operations and needs of the corrections sector as a whole, including the Federal customers, such as the Federal Bureau of Prisons (BOP), Immigration and Customs Enforcement (ICE), the U.S. Marshals Service (USMS), and the Office of the Federal Detention Trustee (OFDT). I also understand the relative operations of non-Federal customers such as state departments of corrections and police departments or sheriffs' offices of larger metropolitan areas.

4. I am an active member of the American Correctional Association ("ACA"), which is one of the most significant organizations for the corrections industry including federal, state, and local governments. ACA has more than 20,000 active members. I attend ACA events and other industry events.

5. I am familiar with our primary private competitors, which include Corrections Corporation of America ("CCA"), LCS Corrections Services, Inc. ("LCS"), and Management & Training Corporation ("MTC").

6. Additionally, in many non-BOP procurements, facilities operated by state or local governments also compete against GEO. For some states' department of corrections contracts, GEO must compete against the existing government-owned or government-owned and operated facilities. For many federal ICE, USMS, and OFDT procurements GEO must compete against the detention facilities of cities and counties.

7. For the reasons set out below, releasing GEO's trade secrets and commercial confidential and proprietary information to any of these competitors would likely cause GEO substantial competitive harm.

## I. Competition in the Corrections Market

8.  The corrections industry is highly competitive for many reasons: significant and risky capital investment; government owned contractor operated contracts; underbidding competition strategies; specialized equipment and specialized vendors; and long term contracts.

9.  <u>Significant and Risky Capital Expenditure</u>: Many corrections contracts require the contractor both to provide a facility and to operate that facility. This involves significant long term capital investment. Furthermore, many corrections contracts only allow offerors to propose existing facility capacity. Thus, to remain competitive and expand market share, a company must build new facilities or expand existing facilities to maintain excess capacity in anticipation of future contracts. While this might be seen as a barrier to entry that would reduce competition, it in fact amplifies competition because the construction or expansion of a facility involves significant risk thereby amplifying the competitive environment. In my experience, competition becomes keener as the market becomes riskier.

10. <u>Government Owned Contractor Operated ("GOCO") Contracts</u>: By contrast to the CAR 5 and CAR 6 procurements, some corrections contracts are GOCO contracts, in which the contractor must operate a government-owned facility. Because the contractor is not burdened with the substantial cost of the facility itself, the remaining price and operational factors are increasingly competitive. For instance, staffing plans and operational approaches carry greater competitive weight in GOCO procurements because there is no distinction between offerors based on differing capital expenses.

11. <u>Strategy of Underbidding</u>: Percentage of market-share is a critical competitive element in the privatized corrections market. This creates substantial incentives for a company to increase market share, even at the risk of losing money on a contract. There are multiple reasons that even a nominally unprofitable contract is rational. First, if the contract is performed at a facility that would otherwise be empty, a contract award can mitigate the full carrying costs (*e.g.*, financing) and upkeep costs associated with an unused facility. Furthermore, expanding on this scenario, if each of two companies has a detention facility which would be unused but for a particular contract, whichever company does not win the contract will suffer even greater loss, e.g., carrying costs of an unused facility.

12. <u>Special Requirements Requires Specialized Vendors</u>: The pool of vendors that can provide particular items is limited to those vendors that meet the specialized needs of a corrections facility. This is a significantly smaller pool than the pool of all commercial vendors. For instance, a corrections facility cannot simply use a folding table from a general office supply vendor or big box retailer; the corrections need is for a specially designed and manufactured table to prevent tampering, such as removing wood or metal for use as weapons. This limited pool of vendors minimizes competition among vendors and means that any information that is released regarding pricing or contract terms would

PAGE - 3   Declaration of Kyle Schiller
 *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

allow vendors to ratchet up their prices, or allow competitors to ratchet down the prices they pay a vendor, resulting in competitive harm to GEO either way.

13. <u>Long Term Contracts</u>: BOP contracts, including the CAR contracts, tend to be long term contracts, normally spanning ten years. The distribution between base period and option period varies slightly, but it tends to be either a three-year base period, with option periods for the remaining seven years, or a four-year base period, with option periods for the remaining six years. Facilities tend to be operated in the same manner, down to the specific number of people in a given position on a particular shift, during the full ten-year period of performance. Accordingly, the passage of time from when a proposal was submitted does not limit or mitigate competitive harm caused by release of confidential or proprietary proposal information, as that information is normally still in use for ten years or longer.

## II. Actual Competition For CAR Contracts and CAR Contract Renewal

14. As discussed above, the information provided by GEO in relation to CAR 5 and CAR 6 is not unique to those procurements and would likely cause substantial competitive harm to GEO within the corrections industry market in general.

15. There have been 12 CAR solicitations. The CARs are not homogeneous and vary in number of beds, number of facilities, geographic location, and facility ownership. Some CARs awarded all the beds solicited (CAR 5 and CAR 6), some did not (CAR 1) and some were cancelled (CAR 2, CAR 3, and CAR 9).

16. Several more recent CAR procurements show the significant competition and shifts between different companies, illustrating significant competitive harm for the losing company. After a particular CAR contract expires, a new CAR procurement is normally issued to "re-bid" the amount of bedspace and security level that had been provided under the expired CAR contract. CAR 10 in 2009 was the re-bid of CCA's California City and Cibola County facilities, which CCA originally won under CAR 1. CCA won a portion of CAR 10 for the Cibola County facility, but lost any use of its California City facility to Cornell's D. Ray James facility. This was a significant loss for CCA because it owns the California City facility and will continue to incur financing and carrying costs even if the facility is unused. CAR 7 was the re-bid of the government owned Taft Federal Correctional Institution in California; GEO lost this to MTC. As a "GOCO," CAR 7 reflects the potential competitive harm from smaller competitors, such as MTC, that can use GEO's staffing plans and other operational approaches to undercut GEO's proposed cost. CAR 12 also illustrates the competitive risk in the corrections sector. CAR 12 is a re-bid of CCA's McRae Correctional Facility. CCA owns the McRae facility and will be competing against other contractor owned facilities, each of which costs upwards of $100 million to construct.

17. CAR 6 was a unique procurement by comparison to other CAR procurements as well as BOP procurements in general. Historically, CAR 6 came at a time when there was

**PAGE - 4  Declaration of Kyle Schiller**
*Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

significant political pressure to expand criminal alien detention. This resulted in a substantial demand for bedspace and higher than usual funding for procuring this bedspace. Accordingly, this unique situation of high demand and high funds was itself less competitive than the preceding and subsequent CAR procurements, as well as less competitive than the full range of procurements beyond CAR.

18. Even though the CAR 6 procurement itself may have been less competitive, the information submitted in CAR 6 proposals was no less confidential and proprietary, nor was this information any less likely to cause substantial competitive harm in all of the other more competitive procurements.

19. Based on my personal experience with at least eleven contract proposals to BOP on behalf of GEO, BOP tends to use a "best value" procurement methodology. By comparison, this is distinct from a "technically acceptable, lowest price" procurement methodology, which tends to make price a significantly more important factor. In the "best value" methodology, BOP considers price as one of multiple factors. These other factors generally include an evaluation of the offeror's technical proposal and past performance on other contracts. That said, price and technical proposal are heavily interrelated. A significant element of any technical proposal is the staffing plan. The staffing plan, in turn, drives personnel costs. Although personnel costs vary from company to company they tend to be the most significant cost element by far.

20. Additionally, most BOP procurements, including the CAR procurements, involve initial proposals from all offerors, and subsequent additional negotiations with a smaller group of offerors called the "competitive range." Only offerors in the competitive range for a particular procurement are allowed to make "best and final offers" ("BAFOs"), from which the agency awards specific contracts. This multi-tiered procurement process further creates competition to get into the competitive range, amplifying the overall competitiveness of the procurement and potential for competitive harm.

### III. Proprietary Business Models

21. GEO has invested significant resources into developing our proprietary business model. Development and application of this business model necessarily includes the coordination of the following interrelated elements: staffing, vendors and service providers, equipment purchase vs. equipment leasing, maintenance costs, pricing methodology, and facility design and construction.

22. Additionally, to avoid confusion, I have used the phrase "GEO's business model" to include the Cornell business model, which was part of the value in GEO's recent acquisition of Cornell. For purposes of future procurements, the "Cornell business model" will play a significant role in bidding proposals at facilities previously owned by Cornell as well as GEO's facilities in general.

   A.   Staffing

**PAGE - 5   Declaration of Kyle Schiller**
  *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

23. <u>Staffing</u>: Staffing information includes the following types of documents and information, each type entails proprietary information, the release of which is likely to result in substantial competitive harm: (1) Staffing Charts that list the types of positions and the number of personnel required for each position; (2) Shift Schedules (also referred to as Post Assignment Schedules) that list positions and numbers by shift, as well as relief factors; (3) Activation Schedules that show the specific timeframes for particular personnel to begin work at the facility, including training; and (4) Dot Diagrams that show the specific location of each person within the facility.

24. The primary competitive harm related to staffing information is that competitors have significant flexibility as to the specific types of positions to perform contract requirements and the number of people hired for each position. Revealing this information would allow competitors to undercut the number of people for a particular position. Along the same lines, the Shift Schedule and the Activation Schedule present a particular risk of competitive harm because they are premised on formulas with variables set by the offeror. Thus enabling one offeror to undercut another in a very precise manner. In the Shift Schedules, the relief factor is this key variable. Relief factor is the ratio or percentage by which the base staffing number for a given position is multiplied to ensure there is sufficient additional staff to cover individuals being unable to work (e.g., sick leave, vacation). There is a different relief factor for each individual position type and although there are generally accepted "floor" and "ceiling" ratios, there is significant flexibility within those outer boundaries. Relief factor for individual positions can be calculated from the raw shift assignments or on the summary sheet, which specifically calls out the relief factor and different types of relief (regular, vacation, holiday, sick leave, and training).

25. In the Activation Schedules, the key variables are the start point and duration for each position type. The Activation Schedule determines when and for how long particular staff will start prior to receiving prisoners at a facility. As soon as a particular type of staff is activated they begin incurring costs (primarily salary and benefits expenses). Strategic fractional reductions in the time period that a particular position type is activated prior to full facility operation can significantly reduce start-up costs. But, it may also encourage unreasonably short activation periods, resulting in delays or performance problems. Based on this balance between start-up costs and sufficient activation, it is not in BOP's interest to force contractors into unreasonably short activation periods through contractor competition. Knowing one company's Activation Schedule would allow a competitor to strategically choose to undercut the activation or start-up time period for a particular type of staff, thus undercutting that offeror's per diem rate.

26. Dot Diagrams are visual representations of staffing plans and shift schedules, showing physical location of different personnel within the facility. By showing the same level of detail of position types, and number people for each position in total and in each shift,

**PAGE - 6  Declaration of Kyle Schiller**
*Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

    Dot Diagrams pose the same risks of substantial competitive harm by providing information to competitors that can be used to underbid GEO in future procurements.

27. Additionally, the Service Contract Act applies to almost all contracts with the federal government and requires personnel in particular job positions be paid at particular rates set by the Department of Labor ("DOL"). This enhances the likelihood of substantial competitive harm from disclosure of staffing information well after contract award because the newer DOL wage rates can be applied to previous staffing information to determine a very accurate estimate of current or future personnel costs, which can be used to undercut new proposals.

    B.    Vendors

28. <u>Vendors and Service Providers</u>: Subcontracts with vendors, service providers, and equipment providers are predominantly long term contracts which cannot be changed or terminated easily. This exacerbates the competitive harm, because once known, competitors can use this information and the injured company cannot change course or take actions to mitigate the competitive harm. A particular example of vendor and service provider harm is whether a competitor uses a food company to provide meals, or whether the competitor hires internal staff to provide food service directly. Vendor and service provider information is only revealed in the documents discussed below in Section IV as part of staffing plans and in the detailed pricing breakdowns provided as past contract documents.

    C.    Equipment

29. <u>Equipment Purchase vs. Equipment Leasing</u>: The decision of how to provide substantial equipment varies from facility to facility and contractor to contractor. The likely substantial competitive harm is similar to the harm caused by disclosure of vendors and service provider information. If a competitor knows that an offeror has purchased equipment for use in a particular facility that will incur a fixed cost until the item is fully depreciated, they can adjust their proposals accordingly. Competitive harm is caused by competitors knowing how a particular company is approaching a particular procurement, or approaches procurements of that certain type (security level, number of prisoners, geographical location, etc.). Equipment approach information is only revealed in the documents discussed below in Section IV(B)(3) in the detailed pricing breakdowns provided as past contract documents.

    D.    Maintenance

30. <u>Maintenance Costs</u>: Maintenance costs involve elements of staffing plans as well as treatment of equipment. A company's approach to maintenance can also particularly factor into the technical evaluation score of an offeror's proposal. A proposal which conveys a higher number of specialized maintenance personnel may be nominally more expensive, but it may convey more significant genuine commitment to maintenance and

safety and security issues in operating a facility, which can in turn result in a competitive advantage and thus, a higher technical evaluation. In the alternative, if a competitor knows what specific maintenance staffing a company has used in the past, the competitor can strategically undercut that staffing with a significant competitive advantage--reducing staffing just enough for a cost savings, while ensuring sufficient staffing to meet the same technical evaluation threshold. Without the specific maintenance information, the competitor would not be able to act so specifically or strategically and would run the risk of overstaffing or understaffing resulting in overpricing or underpricing, respectively. Maintenance cost information is only revealed in the documents discussed below in Section IV as part of the information that would be revealed by the various staffing plans, both as proposed for the CAR contracts as well as in past contract documents.

  E. Pricing

31. <u>Pricing Methodology</u>: Different contracts allow for different forms of per diem rate formulae. Some contracts have a substantial base annual payment amount (paid in monthly amounts) and then a fixed incremental unit price (FIUP) for each prisoner above a certain prisoner population figure, such as the CAR 5 and 6 contracts. Other contracts have multiple per diem rates for different usage levels or different prisoner security levels. Furthermore, although total estimated contract value is routinely released by government customers, the specific per diem rate formula is typically protected. Knowledge of what type and dollar value of per diem rates a company has proposed can cause competitive harm in two ways. First, it is a specific element of undercutting a competitor's bid. Second, knowledge of a company's specific strategies for offering alternative per diem rate formulations allows competitors to adjust their own alternative formulations for initial offers, significantly reducing the competitive advantage of the company whose formulations were released.

  F. Facility Design and Construction

32. <u>Facility Design and Construction</u>: This element of the GEO business model includes the proprietary and confidential formulas and approaches used in designing new and expanded facilities for GEO. GEO views these designs as trade secrets. This also includes working with operational planners regarding staffing issues such as the Dot Diagrams, discussed above as a type of staffing plan. All of these functions are focused on increasing efficiencies through better design and better implementation. Correspondingly, knowledge of how GEO would expand a facility or reorganize the use of an existing facility would substantially harm GEO's competitive position by enabling competitors to duplicate these strategies and approaches, which are interrelated with all other aspects of a proposal.

33. Each of the types of information listed above is considered to be either a trade secret (*e.g.*, business model, facility design) or proprietary commercial information (*e.g.*, pricing, staffing) that is kept confidential, or both. Cornell and GEO both take actions to protect the types of trade secrets and confidential and proprietary information described

above. Within the company, this includes internal firewalls and partitions which limit what information particular employees can access and access is limited to only those employees with particular need to know the information. This includes actively asserting FOIA Exemptions and arguments for withholding this information from disclosure by government customers, and engaging in legal action when necessary.

### IV. Types of Trade Secrets and Confidential and Proprietary Information, The Release of Which Is Likely to Cause Substantial Competitive Harm

34. The following sections describe the specific documents and portions of documents which must be withheld because its release poses a likelihood of substantial competitive harm to GEO. Throughout the following explanations Bates numbers are used when possible, but the Technical Proposal Volumes and the Past Performance Volumes of the three proposals were not Bates numbered by the Government. For these documents I have tried to use sufficient detail in the description to define the particular document or portion of document. These sections are outlined as follows:

> A. Cornell Proposal of Big Spring Facility for CAR 6
> 1. Pricing Schedules
> 2. Staffing Plan and Staffing Information
> 3. Past Contract Documents and Information
>
> B. Reeves County and GEO Proposals of Reeves County Facility for CAR 5 and CAR 6
> 1. Pricing Schedules
> 2. Staffing Plan and Staffing Information
> 3. Past Contract Documents and Information

### A.    Cornell Proposal of Big Spring Facility for CAR 6

35. I am personally familiar with the proposal Cornell submitted for CAR 6, in response to RFP-PCC-0010, which resulted in Contract DJBIPC004. For RFP-PCC-0010, Cornell proposed to use its Big Spring, Texas Facility. The proposal is divided into four volumes: Volume 1: Offer and Other Documents; Volume 2: Technical Proposal; Volume 3: Past Performance and Experience Information; Volume 4: Environmental Documentation. The first page of Volume 1, following the three-page cover letter, is the Submittal Inventory, which includes the following protective legend, specifically designating the following information as protected and not subject to disclosure: "Pricing Schedules[;] Section J - Attachment 10[;] all contracts provided in the Decisional Rule Criteria[;] . . . pages 3-4 under the BOP Contract Business Management Questionnaire of Volume 1[;] the Big Spring Correctional Center Organizational Chart (Exhibit 1)[;] the Activation Schedules (Exhibit 4)[;] and the Staffing Plan (Exhibit 5) of Volumes 2A and 2B of this proposal submission."

36. GEO is not asserting that Section J - Attachment 10 or the BOP Contract Business Management Questionnaire should be withheld from disclosure.

**PAGE - 9    Declaration of Kyle Schiller**
*Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

1.  **Pricing Schedules** (Bates Part 1: 17-20; other documents as described)

37. Pricing Schedules: Cornell's (now GEO's) original proposal pricing schedules, Bates numbered Part 1: 17-20, show base period and option year period pricing for two pricing options. This pricing was then subsequently revised in negotiation correspondence with BOP to present "Best and Final Offer" pricing, including four pages, paralleling the original pricing schedule format--a base years page and option years page for two options. In addition to the two options of pricing information paralleling the original pricing schedules, Cornell also provided a new "Option B" pricing schedule at the request of BOP. Both the initial pricing schedules and the "Best and Final Offer" pricing schedules should be redacted in full because they provide monthly and "fixed incremental unit price" (FIUP) as well as the number of "contract beds" offered at different percentages of occupancy. The contract beds figures should also be withheld from disclosure because they can be used to calculate the other rates based on knowledge of the solicitation format and publicly available information, such as the total dollar amount of the contract awarded by BOP. Both the base period and option period individual year to year monthly price reflects proprietary information regarding strategies for pricing over multiple years. Additionally, because the FIUP is expressed as a per inmate per day price it is a relatively small amount (less than $50). Accordingly, even small differences of several cents could make a substantial difference in the total amount GEO is paid during contract performance, when multiplied by the 10% to 25% of the total contract beds that BOP might utilize at the respective FIUP rate. Also, because the FIUP rates are small, all offerors' FIUP rates are likely to be very close to one another, thereby significantly increasing the likelihood of substantial competitive harm if one of GEO's competitors is able to under-cut GEO's FIUP rate pricing. Furthermore, even if the revised pricing information is not withheld from disclosure, the original pricing should still be withheld because it is not the pricing that BOP ultimately selected. Comparison of the original pricing and the awarded pricing would likely cause even further competitive harm by revealing Cornell and GEO's negotiation strategies, which includes the variable aspects of operating the Big Spring facility under the Cornell and GEO business model, and would give competitors a further competitive advantage in their efforts to undercut GEO's future pricing.

2.  **Staffing Plans and Staffing Information** (documents as described)

38. Big Spring Staffing Plan (Technical Proposal Exhibit 5): Cornell's proposal contains a five page highly detailed staffing plan for performing under CAR 6. The Staffing plan provides: work days (such as Monday through Friday, Friday through Tuesday, Variable, etc.), position title, the facility assignment for the position, one of three shift designations for security personnel, a separate shift designation for non-security personnel, relief factor, and total FTEs. The level of detail in this staffing plan would likely subject GEO to substantial competitive harm by revealing elements of its confidential and proprietary business plan for staffing similar facilities. Both the type of positions and the number of people for each position is a proprietary aspect of how GEO chooses to staff a particular

facility. Were a competitor to obtain this information, the competitor could undercut GEO's proposal for any similar contract. Cornell's proposal also contained a three page salary and wage sheet, which should also be withheld from release. The salary and wage sheet again reveals the specific detailed positions used for staffing the facility; this in turn reveals key elements of GEO's general strategy for operating facilities and would likely cause competitive harm by allowing competitors to develop their own staffing plans in a manner to undercut or counter GEO's staffing plans.

39. <u>Big Spring Correctional Center Organizational Chart (Technical Proposal Exhibit 1)</u>: This Organizational Chart presents the same type of risk for competitive harm as the Staffing Plans. It provides the specific position types as well how many people will be needed for each position. Accordingly, a competitor could reverse engineer GEO's business model for staffing a similar facility and undercut this staffing model by using different position types or reducing the number of personnel for a given position. The specific competitive harm is caused by the specificity with which a competitor would be able to undercut GEO's business model.

40. <u>Big Spring Activation Schedule (Technical Proposal Exhibit 4)</u>: The Activation Schedule should be withheld in its entirety because it reveals GEO's proprietary business model for when and how long (prior to full operation) each position type will be activated. This is likely to cause substantial competitive harm because the margins on activation of each position type are very tight, but still variable within each offeror's discretion. As with the FIUP rates from the pricing schedule, a small change in start-up period for a given position type is multiplied by the number of people in that position type. When competitors' activation schedules are unknown, all offerors are on an equal footing, but if the information of one competitor's activation schedule is released, competitors could then strategically undercut that schedule without blindly undercutting themselves, resulting in substantial competitive harm.

          **3.**     **Past Contract Documents** (Bates numbers provided in each sub-section)

41. In response to the RFP's requirement for contracts for the Decisional Rule Criteria,[1] Cornell provided the following six contracts and a chart summarizing similar adult secure contracts for the three years preceding submission of proposals. The six contract files provided in full are (i) Baker Community Correctional Facility Contract, (ii) Leo Chesney Community Correctional Facility Contract, (iii) Big Spring Correctional Center

---

[1] The Decisional Rule Criteria, was a requirement that all offerors must provide evidence at the time of submittal the offeror had corporate experience to operate a secure corrections/detention facility. Cornell satisfied this requirement by providing entire sets of contract documents for multiple contracts. Reeves County and GEO satisfied this requirement by providing detailed narratives and summary sheets of prior contracts.

**PAGE - 11  Declaration of Kyle Schiller**
         *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

Contract,[2] (iv) D. Ray James Prison Contract, (v) Donald W. Wyatt Detention Center Contract, and (vi) Great Plains Correctional Center Contract. The form and level of detail in the documents supporting each of these contracts varies. The general categories of documents are: (1) Staffing Plans; and (2) Pricing Details.

42. *Baker Community Correctional Facility-Staffing Plans*: (Bates numbers Part 6: 1, 5-7, 14, 15, 16-19, 31, 33, 34-37, 43, 45, 46-49, 77) The Baker Staffing Plans that should be withheld from disclosure include four types of documents: a detailed single page staffing plan (Bates numbered as Part 6: 1, 15, 31, 43, 78); a multi-page Post Assignment Sheet (Bates numbered as Part 6: 5-7, 16-19, 34-37, 46-49); a Post Assignment Sheet Summary (Bates numbered as Part 6: 14, 33, 45); and a Facility Organization Chart listing the number of people in each position (Bates numbered as Part 6: 77).

   a. The detailed staffing plans list every individual position by position title and functional group (such as administration, security, *et cetera*), the number of people needed within a given position title, the monthly salary per person, total monthly salary, and total annual salary. The detailed staffing plan also lists a total for overtime expenses. All of the information on these types of pages should be withheld because it reveals how GEO distributes its personnel, which in turn reveals its proprietary business model for operating similar facilities. To this end, the salary figures are more sensitive as a means for reverse engineering the staffing distribution than as a particular dollar figure. For instance, if the monthly salary per person and the total annual salary are known, the number of people for a given position can be calculated by dividing the annual salary by twelve and dividing the resulting monthly salary by the per person monthly salary. Additionally, what particular positions are listed in the staffing plan can pose substantial competitive harm. For instance, knowing how a competitor staffs a general contract requirement for a given prisoner program, such as educational programs, would allow a competitor to develop their own staffing plan to undercut that same contract performance element.

   b. Multi-Page Post Assignment Sheets and Post Assignment Sheet Summaries provide another source of the same type of detailed per position information, which reveals a contractor's proprietary business model for similar facilities. Additionally, both types of post assignment sheets indicate the relief factor for each position. Relief factor is a percentage for calculating how many additional people are necessary to cover holiday, time off, and other events. Because detention facilities must be operated at all times, there must be additional personnel to fill in when an individual is unavailable. Similar to the FIUP in the pricing schedules, relief factor is a key variable for which a small change can significantly modify the ultimate proposal amount. Knowing a competitor's relief factors can provide a significant competitive advantage. This would result in

---

[2] To clarify, these documents are for the past operation of Big Spring, as opposed to the forward looking information proposing the use of Big Spring for CAR 6.

**PAGE - 12  Declaration of Kyle Schiller**
   *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

substantial competitive harm to GEO by forcing GEO to either be undercut or try to counter such expected undercutting and in turn over compensate--either way resulting in substantial competitive harm.

c. Additionally, as a security consideration beyond competitive harm, the Post Assignment Sheets show exactly when particular guards and other staff are at particular posts or locations. Release of this information poses a *bona fide* threat for the security of prisoners and employees, as release of this information to the public inherently also means release to prisoners.

d. The Facility Organization Chart presents the same type of risk for competitive harm because it directly provides the position types proposed, as well as the specific number for each position.

43. *Baker Community Correctional Facility--Pricing Details*: (Bates numbers Part 6: 2, 8, 12, 13, 25-29, 32, 44)

   a. The Baker contract documents include multiple iterations of a detailed pricing sheet (Bates numbered as Part 6: 2, 8, 12, 13, 32, 44), which breaks the total cost down into the following categories: staff and benefit/taxes, training, transportation costs, consultant services, equipment replacement, general operating costs, food costs, administrative costs, corporate fee, total cost, per diem rate, facility lease, general liability and grand total. Although the "grand total" may have been released as part of contract award announcements, the detailed breakdown is likely to result in substantial competitive harm by revealing the distribution of expenses between the listed categories. Knowing the ratios of these particular categories to a total per diem rate or total award amount would reveal the general model of GEO's proposals, thus competitors could track likely spending on any given category and then strategically select particular cost categories to undercut. Likewise, particular categories, such as "food costs" either reflect the cost of a vendor under contract or the cost of employees and supplies. Using other information, such as staffing plans, a competitor could determine what a particular food vendor was charging and thus undercut that price.

   b. The Baker contract documents also include a cost calculation or breakdown for a particular renovation project (Bates numbered as Part 6: 25-29). All cost figures on these pages should be withheld as they reflect the calculation of information supporting possible renovations at the facility. These renovation figures reveal internal proprietary information such as insurance increase estimates. The release of this document would result in competitive harm by allowing competitors to determine the assumptions underlying this renovation project and thus determine the renovation calculations that GEO would be likely to use for similar renovations.

**PAGE - 13  Declaration of Kyle Schiller**
  *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

44. *Leo Chesney Community Correctional Facility-Staffing Plans*: (Bates numbers Part 12: 6, 44, 51, 58, 59, 60; Part 13: 4, 11, 14, 23, 28, 30, 31-33, 44, 46, 47-49, 54, 56, 57-59) Like the Baker contract, Leo Chesney was a contract with the California Department of Corrections, so the types of documents—and the explanation for withholding them from release—are the same. The Leo Chesney Staffing Plans that should be withheld from disclosure include three forms of staffing plans: a detailed single page staffing plan (bates numbered as Part 12: 6, 44, 51, 58, 59, 60; Part 13: 4, 11, 14, 23, 28, 44, 54); a multi-page Post Assignment Sheet (bates numbered as Part 13: 31-33, 47-49, 57-59); and a Post Assignment Sheet Summary (bates numbered as Part 13: 30, 46, 56).

45. *Leo Chesney Community Correctional Facility-Pricing Details*: (Bates numbers Part 12: 7, 45, 50, 61, 62, 63, 64; Part 13: 5, 12, 15, 24, 29, 39-41, 45, 55) As with the preceding paragraph, the Leo Chesney Pricing Details also parallel the Baker Contract Documents, discussed above. The Leo Chesney Contract Documents include the same form of price breakdown sheet as discussed above (Bates numbered as Part 12: 7, 45, 50, 61, 62, 63, 64; Part 13: 5, 12, 15, 24, 29, 45, 55). The Leo Chesney Contract Documents also contain the same kind of document showing renovation calculations (Bates numbered as Part 13: 39-41), which poses the same likelihood of substantial competitive harm as described above.

46. *Big Spring Correctional Center-Contract Documents*: This portion of the proposal provides documents relating to the inter-governmental agreement between the Federal Government and the City of Big Spring, under which Cornell operated the Big Spring Facility. There are no staffing plans or pricing details in this segment that should be redacted.

47. *D. Ray James Prison Contract-Staffing Plans*: (Bates numbers Part 7: 6-8, 13-15, 104-107, 108-112) The D. Ray James contract documents include two types of staffing plans. The first type (Bates numbered as Part 7: 6-8, 13-15, 104-107) are detailed staffing plans providing the specific position titles, the number of people for each position (broken out by shift), and the relief factor. The second type is a supplemental staffing plan letter from the then Cornell Vice President to the government customer (Bates numbered as Part 7: 108-112). This letter provides specific additional figures for specific positions, as well as shift rotations. All of these documents should be redacted in their entirety to remove the specific positions listed, the number for each position, the shift by shift distribution, and the relief factor. Additionally, because of the requirements of the Service Contract Act, there is a constant alignment and re-alignment of what particular position descriptions fit what particular contractual needs. All of this information is likely to cause substantial competitive harm by providing competitors with information on GEO's business model for similar facilities, as well as the particular issues raised by competitive knowledge of the relief factor used, discussed above. Also, release of shift by shift information poses a bona fide security concern, identifying when a particular post or function will not be manned.

48. *Donald W. Wyatt Detention Center-Contract Documents*: The contract documents provided by Cornell for the Donald W. Wyatt Detention Center (Bates numbered as Part 8) do not contain staffing plans nor pricing details.

49. *Great Plains Correctional Facility-Contract Documents*: (Bates numbers Part 10: 11) The one-page document in the Great Plains Contract Documents (Bates numbered as Parts 9, 10, and 11) that should be withheld from release is a staffing plan (Bates numbered as Part 10: 11). This staffing plan lists position type and number of full time equivalents ("FTEs"). The position titles are highly detailed, listing sixty three distinct positions. With this level of detail a competitor would be able to obtain specific insight into GEO's staffing distribution models. By knowing this information, a competitor could select particular positions in GEO's model and claim to provide the same functionality with non-DOL Wage Rate positions, enabling the competitor to submit a lower initial bid.

### B. Reeves County and GEO Proposals of Reeves County Facility for CAR 5 and CAR 6

50. I am personally familiar with the proposal Reeves County Texas and GEO submitted for CAR 5, in response to RFP-PCC-009, which resulted in Contract DJB1PC003, as well as the proposal Reeves County Texas and GEO submitted for CAR 6, in response to RFP-PCC-0010, which resulted in Contract DJP1PC007. Both proposals are broken into four volumes: Volume 1: Offer and Other Documents; Volume 2: Technical Proposal; Volume 3: Past Performance and Experience; and Volume 4: Environmental Documentation. The particular types of information that constitute trade secrets or confidential and proprietary business information, the release of which is likely to cause substantial competitive harm are: Pricing Schedules, Staffing Plans (including Dot Diagrams and Facility Level Organization Chart), Activation Schedules, Per Diem Rate Details from Decisional Rule Criteria Summaries and Past Performance Summaries, and Development/Construction/Renovation Summary Sheets. The following documents are not designated by Bates numbers, but are described with specificity.

#### 1. **Pricing Schedules** (documents as described)

51. <u>Pricing Schedules</u>: Both CAR 5 and CAR 6 proposals contain pricing schedules similar in form to the pricing schedules described above in the Cornell/GEO Big Spring CAR 6 proposal. Although the Declaration of Tom Barry provides what he asserts are pages from the Reeves County CAR 5 contract, these are not the same documents, nor the same information, as were submitted in the original Reeves County and GEO CAR 5 proposal. The documents attached to the Declaration of Tom Barry, are titled "pricing revisions" and would not have been part of the original proposal.[3] The specific information which

---

[3] Given the dates (November and December 2006) on the two pricing schedules attached to the Barry Declaration, and the preceding contract form page referencing RFP-PCC-0010 (the CAR 6 RFP), although Reeves County purportedly produced these documents in response to a

**PAGE - 15   Declaration of Kyle Schiller**
     *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

must be withheld is the contract beds figures, the monthly ramp up price, the monthly operating price, and FIUP for the base year periods and the option year periods. In the CAR 6 proposal, the cover letter to Volume 1 transmitting the proposal, also contains the same information in two bold and underlined sentences, which must also be withheld. Additionally, as discussed above, the initial offer information should certainly be withheld from disclosure even if the revised and final pricing is ultimately released, because the original pricing was not incorporated into a final contract. The risk of substantial competitive harm from this information is the ability of competitors to undercut GEO on future contracts. As further detailed above, the FIUP poses a particularly strong risk of substantial competitive harm because these amounts are relatively small (less than $50) and being slightly above or slightly below a competitor can make a substantial difference in overall proposal price.

    **2.    Staffing Plans and Staffing Information** (documents as described)

52. <u>Staffing Plans</u>: GEO's CAR 5 and CAR 6 Proposals for Reeves County contain detailed four page Staffing Plans,[4] detailed Dot Diagrams, and detailed Facility Level Organizational Charts.

    a. The Staffing Plans contain the following categories of information: position title, organizational group, annual salary, hourly wage, 5 or 7 day work week, shift designation, relief factor, and total FTE. As described above, each of these categories of information must be withheld from disclosure because of its likelihood to cause substantial competitive harm. In particular, the shift designation and relief factor would allow a competitor to specifically undercut GEO's staffing costs. Additionally, the specific position titles are sufficiently detailed to reveal what specific types of positions are being used for specific functions. Because of the flexibility and business decisions involved in choosing how to staff a particular functional need, this is part of a company's proprietary and confidential business model that is used from proposal to proposal, and the release of this information would harm GEO's future proposals, and GEO's competitive position.

    b. The detailed Dot Diagrams are architectural diagrams of the facility, with specific dots (colored circles, squares, and triangles) showing the specific location where a position will perform its function. As noted above, the release of this type and detail of information poses a bona fide security risk and should be withheld from release on those grounds alone. Furthermore, the Dot Diagrams provide sufficient detail to pose the same type of likely competitive harm as caused by release of the

---

request for CAR 5 documents, these are clearly documents related to CAR 6, which calls into question the veracity of the documents produced or what methods Mr. Barry used to acquire these documents.

[4]    These staffing plans are different and contain different information than the cost chart included as Exhibit B to the Tom Barry Declaration.

**PAGE - 16  Declaration of Kyle Schiller**
    *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

detailed Facility Level Organizational Charts. Based on the Dot Diagrams or Organizational Charts, a competitor could reverse engineer the full staffing plan, including detail of position title down to the specific specialized position and the total number of people for a specific position. The Dot Diagrams also add information on shift distributions.

53. <u>Activation Schedules</u>: GEO's CAR 5 and CAR 6 Proposals for Reeves County also include detailed Activation Schedules. As described above, Activation Schedules reveal substantial information as to when and for how long particular tasks or personnel will be activated during the contract start-up process. A competitor could easily undercut GEO by strategically reducing particular start-up tasks. If one company were to see a competitor's Activation Schedule, that company would be in a significantly stronger position to develop its own Activation Schedule, knowing when and where certain start-up tasks could be limited or focused for significant competitive advantage.

### 3. Past Contract Documents and Information (documents as described)

54. <u>Per Diem Rate Details from Decisional Rule Criteria Summaries and Past Performance Summaries</u>: Both the CAR 5 and CAR 6 proposals contain multi-part past performance contract summaries. The CAR 5 proposal contains information on 31 contracts and the CAR 6 proposal contains information on 46 contracts.

   a. In both proposals the summary of any single contract is a four part document: first, a narrative regarding the facility; second, a detailed contract specifications document; third, a list of occurrences; and fourth, a performance/process improvement narrative. GEO seeks to have several items redacted from the second part of each contract summary. Specifically, these items are the detailed year-by-year population and per diem rate charts and the "staff complement" charts showing staffing by position title. The year-by-year population and per diem rate charts are particularly detailed and reveal substantial sensitive information regarding trends of GEO's per diem rates during contract performance, which could be used by competitors to more accurately model GEO's business strategies and then undercut these strategies. The "staff complement" charts pose the same threat of likely substantial competitive harm as staffing plans in general.

   b. In addition, the CAR 5 Proposal contains 11 two-page contract summaries for GEO's portion of the "Decisional Rule Criteria." The first page of each summary is a narrative and the second page is a contract detail summary, which contains detailed capacity and per diem rate information. As described above in the section regarding per diem rate methodologies, a competitor could reverse engineer GEO's per diem rates using the annual contract amount (which can be obtained through other sources) and the detailed capacity information on these summary sheets. On some of the summary sheets the capacity information is sufficiently detailed to reverse engineer the more complicated multi-part per diem

**PAGE - 17  Declaration of Kyle Schiller**
  *Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST

rates, which would cause particular competitive harm. For instance, this more detailed capacity information could take the form of ranges of capacity, and the corresponding per diem rate section could then in turn have different rates depending on the capacity ranges. The CAR 6 Proposal contains two sets of 52 single page summaries of "Current Contracts," which contain capacity and detailed per diem rate information in the same format as the CAR 5 Proposal Decisional Rule Criteria summaries, and pose the same likelihood of substantial competitive harm.

55. <u>Development/Construction/Renovation Summary Sheets</u>: In support of GEO's capabilities and other Past Performance information, the CAR 5 and CAR 6 proposals contain a five page summary of GEO's North American and Worldwide construction and expansion. The sheet is maintained as a confidential document and reveals confidential information specific to these construction and expansion protects, which should be withheld. The specific information which should be withheld for each entry is: the facility name and location, total square footage, square footage bed/cell space, rated capacity, type of construction, construction time, and cost of construction. This information reveals GEO's specific approach and business models for construction and expansion of existing facilities. As discussed above, because detention facilities--and their expansions--are significant capital investments release of this information would cause specific competitive harm by allowing competitors to know when and how GEO tends to engage in these projects.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 5th day of November, 2010.

_____
Kyle Schiller

**PAGE - 18   Declaration of Kyle Schiller**
*Stephen Raher v. Federal Bureau of Prisons*; CV 09-526-ST