IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

STEPHEN RAHER

                        Plaintiff,                          CV-09-526-ST

        v.                                          OPINION AND ORDER

FEDERAL BUREAU OF PRISONS,

                        Defendant,
            and

THE GEO GROUP, INC.,

    _____ Defendant-Intervenor._____

STEWART, Magistrate Judge:

## **INTRODUCTION**

        Plaintiff, Stephen Raher ("Raher"), brought this action under the Freedom of Information

Act ("FOIA"), 5 USC § 552, to obtain documents from defendant, the Federal Bureau of Prisons

("BOP").  In November 2008, Raher submitted a FOIA request to BOP for five categories of

records pertaining to the solicitation, evaluation, and award of contracts by BOP to provide, maintain, and operate private detention facilities for foreign nationals serving criminal sentences imposed by the federal courts. The solicitations at issue are known as Criminal Alien Requirement ("CAR") Phases 1, 2, 5, and 6. In response to the CAR solicitations, five entities engaged in the private prison industry submitted proposals and supporting documentation to BOP. Those five entities (collectively "submitters") are Corrections Corporation of America ("CCA"), Cornell Companies, Inc. ("Cornell"), LCS Corrections Services, Inc. ("LCS"), Management & Training Corporation ("MTC"), and Reeves County, Texas ("Reeves County"). Defendant-Intervenor, The Geo Group, Inc. ("GEO Group"), is the successor in interest to Cornell.

In July 2009, BOP provided Raher with 17 documents comprising 1,764 pages of contracts awarded by BOP under CAR Phases 1, 2, 5 and 6. BOP redacted information from these documents and provided Raher with an initial Vaughn Index describing each responsive document and briefly stating the FOIA exemptions for withheld information.

After the parties conferred and clarified Item 3 of the FOIA request, BOP conducted another search and, in November 2009, provided Raher with 2,056 additional pages, many of which were redacted, and withheld approximately 6,000 pages. Accompanying this production, BOP provided a Supplemental Vaughn Index ("First SVI") stating the basis for withholding information from 65 documents relating to proposals and supporting documents provided by the submitters in response to CAR Phases 5 and 6. These proposals include each submitter's initial offer, revisions and final offer (documents ## 1-47), as well as past performance records, technical proposals for performing the requirements of the contract, and environmental

documentation required under the National Environmental Policy Act (documents ## 48-65).

However, BOP failed to claim any specific FOIA exemption for withholding all the past

performance records, technical proposals, and environmental documentation.  BOP subsequently

provided the environmental documentation to Raher.

BOP and Raher filed Motions for Summary Judgment (dockets # 28 & # 33).  The court

denied BOP's motion, deferred Raher's motion, and ordered BOP to submit by November 5,

2010, the following additional evidence and explanation for withholding information responsive

to Raher's FOIA request:

> 1.  State the precise reason for withholding each specific document or part of document withheld.
>
> 2.  With respect to the information withheld under Exemption 2, describe with particularity how the information is used predominantly for internal purposes and explain how disclosure would present a serious risk of circumvention of agency regulations, statutes, or other legal requirements.
>
> 3.  With respect to the information withheld under Exemption 4, provide evidence of actual competition in the relevant market for CAR contracts and CAR contract renewal and explain how disclosure of each document or part of a document withheld would be likely to substantially harm the competitive position of a specific submitter.
>
> 4.  With respect to the past performance records and technical proposal records, state the precise reason for withholding each document or part of a document and the FOIA exemption under which the withholding is justified.

Opinion and Order dated September 2, 2010 (docket #  48) ("O&O"), pp. 24-25.

This court warned that if "the BOP fails to submit this information, then Raher's motion

for summary judgment will be granted."  *Id* at 25.

On November 3, 2010, this court allowed GEO Group to intervene (docket # 60).  On

November 5, 2010, in compliance with the court's order, BOP produced heavily redacted

documents and an accompanying Second Supplemental Vaughn Index ("Second SVI")

describing the basis for withholding information pertaining to BOP's internal price evaluation

and source selection decision information for CAR Phases 5 and 6 (docket # 65-1).  It also filed a

Third Supplemental Vaughn Index ("Third SVI") (docket # 65-2), describing additional

justifications for withholding 12 documents (## 48, 49, 51, 52, 54, 55, 57, 58, 60, 61, 63 and 64)

referenced in the First SVI, namely the past performance and technical proposal records of the

six submitters for CAR Phases 5 and 6.  All parties filed supplemental memoranda and

declarations addressing the adequacy of the Second SVI and Third SVI.

For the reasons set forth below, Raher's motion for summary judgment is granted in part

and denied in part.

## DISCUSSION

### I.  Exemption 2

BOP relied on the High 2 Exemption under FOIA, 5 USC § 552(b)(2), to justify

withholding portions of documents listed in the initial Vaughn Index, as well as the First SVI,

Second SVI and Third SVI.

In March 2011, the United States Supreme Court invalidated the use of the High 2

exemption.  *Milner v. Dep't of the Navy*, 562 US ___, 131 S Ct 1259 (2011).  As a result,

Exemption 2 may no longer be used to justify withholding records on the grounds that disclosure

would risk circumvention of the law or federal agency functions, or would reveal internal rules

and practices that guide agency personnel in performing their duties.   "Exemption 2, consistent

with the plain meaning of the term 'personnel rules and practices' encompasses only records relating to issues of employee relations and human resources." *Id* at 1271.

Accordingly, BOP cannot rely on the High 2 Exemption to withhold any of its documents, and Raher is granted summary judgment as to Exemption 2. As set forth in Raher's withdrawal of his Motion to Compel Production (docket # 126), BOP has now taken appropriate action to produce documents withheld based solely on the High 2 Exemption.

Because BOP has cited more than one exemption to justify withholding much of the other information, the court must evaluate BOP's other claimed exemptions.

## II. **Third SVI**

The court directed BOP to state the precise reason for withholding past performance records and technical proposal records in the First SVI and the FOIA exemption under which the withholding was justified. O&O, p. 25. The Third SVI complies with that directive by now citing Exemptions 3, 4, and 7 for withholding all or parts of these records. Since Exemptions 3 and 7 pertain only to these records, they are addressed first. Exemption 4 is discussed later in connection with other withheld records.

### A. **Exemption 3**

FOIA Exemption 3, 5 USC § 552(b)(3), protects information specifically exempted by a statute other than FOIA "if that statute . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."

A two-part inquiry determines whether Exemption 3 applies to a particular FOIA request. The court first determines whether the withholding statute meets the requirements of

Exemption 3 and then determines whether the requested information falls within the scope of the withholding statute. *Carlson v. U. S. Postal Serv.*, 504 F3d 1123, 1127 (9th Cir 2007), citing *Minier v. Central Intelligence Agency*, 88 F3d 796, 801 (9th Cir 1996). "The aim of exemption 3 is to incorporate only those statutes where it is clear that the basic policy decision in favor of nondisclosure has been made by the Legislative rather than by the Executive Branch." *Long v. Internal Revenue Serv.*, 742 F2d 1173, 1179, n14 (9th Cir 1984)

BOP argues it can withhold documents under Exemption 3 based on both: (1) the National Defense Authorization Act for Fiscal Year 1997, 41 USC § 253b(m) ("§ 253b(m)"), and implementing regulations found in the Federal Acquisition Regulations Systems ("FARs") of 48 CFR §§ 3.104-3, 3.104-4, 15.207, 15.304, and 15.306, which prohibit disclosure of contractor proposals that are *not* incorporated into a contract with the agency; and (2) the Federal Procurement Policy Act, 42 USC § 423(a) & (f) ("§ 423"), which places restrictions on disclosing contractor bid or proposal information or source selection information.

BOP first invoked Exemption 3 in the Third SVI. Before that at the hearing on the summary judgment motions, BOP conceded that the FARs cited in the first two Vaughn indices were supplemental to the FOIA argument and disclaimed any reliance on them. In addition, at that same hearing, Raher, not BOP, initially brought § 253b(m) to the court's attention. Because § 253b(m) permits disclosure of documents incorporated into awarded contracts, he argued that any documents incorporated into the CAR contracts are not confidential and thus not exempt under FOIA Exemption 4. This court rejected that argument, explaining that "§ 253b(m) intersects with FOIA only to the extent it bars disclosure of unsuccessful proposals. It does not

purport in any way to limit FOIA protection for successful proposals.  In that regard, this court must look only to FOIA for the answer."  O&O, p. 23.

This court is troubled by BOP's shift in position to now relying on FARs that it previously disclaimed.  However, this court invited BOP to supplement its first two Vaughn indices and feels compelled to address BOP's supplemental contentions.  Although this court previously rejected Raher's argument that § 253b(m) negates Exemption 4, it did not address whether BOP may rely on that same statute to invoke Exemption 3.  In addition, this court did not address whether BOP may rely on § 423 to invoke Exemption 3.

The parties do not dispute that § 423 and § 253b(m) are statutes which leave no discretion as to the matters to be withheld.  *See Legal and Safety Emp'r Research, Inc. v. U. S. Dep't of the Army*, 2001 WL 34098652, *4 (ED Ca 2001) ("section 423 is a nondisclosure statute under Exemption 3").  Thus assuming, but not deciding, that the first inquiry to apply Exemption 3 is satisfied, the court moves to the second inquiry as to whether the requested information falls within the scope of the statutes.

To support Exemption 3 for all 14 documents in the Third SVI, BOP asserts that they are "source selection information" prohibited from public disclosure under § 423:

> Congress limited agency discretion to release of information regarding source selection information under Title 41 USC § 423, [*sic*] identifies the records that make up source selection, of which, source selection plans; cost or prices submitted in response to solicitations or lists of those proposed costs or prices; technical evaluation plans; technical evaluation proposals; cost or price of evaluation or proposals; competitive range determinations that identify proposals that have a reasonable chance of being selected for award of contract; rankings of bids, proposals or competitors; reports and evaluations by source selection panels, boards or advisory councils, and other information marked as "source selection information" based on the determination that the source selection official

> felt that disclosure of the information would jeopardize the integrity of the procurement process.

Third SVI, pp. 2, 5, 8, 11, 14, 17, 20, 22, 25, 27, 30, & 32.

In addition, as it pertains to Internal Price Evaluation and Source Selection Decision information from CAR Phase 5, BOP cites Exemption 3:

> for information protected under [§ 253b(m)] regarding information on successful bidders located within the source selection material. Portions of the source selection material contain information that was not set forth or incorporated into an awarded contract.

Second SVI, p. 2.

Neither the Second nor Third SVI cites any FAR in support of Exemption 3.

### 1. **§ 423**

Pursuant to § 423(a)(1), "a person shall not . . . knowingly disclose contractor bid or proposal information or source selection information *before the award* of a Federal agency procurement contract to which the information relates" (emphasis added). "Source selection" is further defined as:

> any of the following information prepared for use by a Federal agency for the purpose of evaluating a bid or proposal to enter into a Federal agency procurement contract, if that information has not been previously made available to the public or disclosed publicly:
> (A) Bid prices submitted in response to a Federal agency solicitation for sealed bids, or lists of those bid prices before public bid opening.
> (B) Proposed costs or prices submitted in response to a Federal agency solicitation, or lists of those proposed costs or prices.
> (C) Source selection plans.
> (D) Technical evaluation plans.
> (E) Technical evaluations of proposals.
> (F) Cost or price evaluations of proposals.
> (G) Competitive range determinations that identify proposals that have a reasonable chance of being selected for award of a contract.
> (H) Rankings of bids, proposals, or competitors.

(I) The reports and evaluations of source selection panels, boards, or advisory councils.

(J) Other information marked as "source selection information" based on a case-by-case determination by the head of the agency, his designee, or the contracting officer that its disclosure would jeopardize the integrity or successful completion of the Federal agency procurement to which the information relates.

41 USC § 423(f)(2)(A)-(J).

According to the implementing regulation, 48 CFR § 3.104-4(a), "no person or other entity may disclose contractor bid or proposal information or source selection information to any person other than a person authorized in accordance with applicable agency regulations or procedures, by the agency head or the contracting officer to receive such information."

The statute, § 423(a)(1), contains an express restriction only against disclosure "before the award." However, the implementing regulation, 48 CFR § 3.104-4(f), is not limited to the pre-award time frame and specifically bars some post-award releases:

This section does not authorize --
(3) [t]he release of information *after award of a contract* or cancellation of a procurement if such information is contractor bid or proposal information or source selection information that pertains to another procurement; or
(4) [t]he disclosure, solicitation, or receipt of bid or proposal information or source selection information *after award* if disclosure, solicitation, or receipt is prohibited by law.

(Emphasis added).

In federal statutory interpretation, the "starting point in discerning congressional intent is the existing statutory text." *Lamie v. U. S. Trustee*, 540 US 526, 534 (2004), citing *Hughes Aircraft Co. v. Jacobson*, 525 US 432, 438 (1999). "The preeminent canon of [federal] statutory interpretation requires [a court] to 'presume that [the] legislature says in a statute what it means

and means in a statute what it says there.'" *BedRoc Ltd. v. United States*, 541 US 176, 183

(2004), quoting *Conn. Nat'l Bank v. Germain*, 503 US 249, 253-54 (1992). Therefore, a court's

"inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Id*,

citing *Lamie*, 540 US at 534. However, the structure and purpose of a statute can provide

guidance in determining the plain meaning of its provisions. *K Mart Corp. v. Cartier, Inc.*, 486

US 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the

particular statutory language at issue, as well as the language and design of the statute as a

whole."). Further, courts presume that when Congress alters the words in a statute, it intends to

change the statute's meaning. *United States v. Wilson*, 503 US 329, 336 (1992). "[I]t is . . . a

'cardinal rule of statutory interpretation that no provision should be construed to be entirely

redundant.'" *Spencer Enters., Inc. v. United States*, 345 F3d 683, 691 (9th Cir 2003), quoting

*Kungys v. United States*, 485 US 759, 778 (1988); *see also Clark v. Capital Credit & Collection*

*Servs., Inc.*, 460 F3d 1162, 1175 (9th Cir 2006).

Statutory text is ambiguous if it is "capable of being understood in two or more possible

senses or ways." *Chickasaw Nation v. United States*, 534 US 84, 90 (2001), quoting *Websters*

*Ninth New Collegiate Dictionary* 77 (1985 ed.). If a statutory provision is ambiguous, a court

looks to the legislative history. *Securities & Exchange Comm'n v. McCarthy*, 322 F3d 650, 655

(9th Cir 2003), quoting *Nw. Forest Res. Council v. Glickman*, 82 F3d 825, 834 (9th Cir 1996).

Reading the statute and the regulations together, there is no ambiguity. The statute bars

disclosure of "contractor bid or proposal information or source selection information before" the

bid is awarded. It does not bar, or even address, disclosure after the bid is awarded. The

regulation fills that gap by barring disclosure after awards or cancellations, but only if it "pertains

to another procurement" or "is prohibited by law."  48 CFR § 3.104-4(f)(3) & (4).  By

designating when disclosure post-award is not authorized, the text of regulation does not bar, and

thus authorizes, post-award disclosure under all other circumstances.  If disclosure were not

otherwise authorized, this language would be redundant.

Other FARs support this view of protecting bid proposals pre-award, but not post-award.

*See* 48 CFR § 3.104-3(a)(1) ("A person described in paragraph (a)(2) . . . must not, other than as

provided by law, knowingly disclose contractor bid or proposal information or source selection

information before the award of a Federal agency procurement contract."); § 15.207 ("Proposals

shall be safeguarded from unauthorized disclosure throughout the source selection process.");

§ 15.306 (limiting exchanges between government and offerors in the time period before an

award); and § 15.506 (outlining post-award debriefing and limiting debriefing to exclude

confidential information or trade secrets, consistent with FOIA Exemption 4).

This court has found no cases directly on point addressing the application of Exemption 3

based on § 423, but other cases confirm that the Federal Procurement Policy Act is primarily

concerned with protecting the procurement process, proposals and pre-award bids.  In *Pikes Peak*

*Family Housing LLC v. United States*, 40 Fed Cl 673 (1998), the Federal Court of Claims

explained that "§ 423, properly understood, is obviously directed at situations in which a present

or former government procurement officer secretly leaks information concerning a pending

solicitation to an offeror participating therein, in the hopes of securing post-government

employment or other compensation from said offeror."  *Id* at 681, citing 41 USC § 423(c), (d).  In

*DGS Contract Servs. Inc. v. United States*, 43 Fed Cl 227, 236 (1999), the court determined that

source selection information may properly be disclosed under certain circumstances which include the post-award debriefing to an unsuccessful offeror.

BOP relies on *Essex Electro Eng'rs v. U. S. Sec'y of the Army*, 686 F Supp 2d 91 (D DC 2010), but that case did not address Exemption 3. It held only that unit pricing information that would otherwise be released under an FAR mandate of disclosure fell within FOIA's Exemption 4 and thus could not be disclosed. *Id* at 94-95.

In sum, Exemption 3 does not protect bid or proposal information from disclosure post-award based on § 423 and its implementing regulations unless it "pertains to another procurement" or "is prohibited by law." None of the documents requested by Raher pertain to another procurement. Whether they are "prohibited by law" from disclosure under § 253b(m) is discussed next.

### 2. § 253b(m)

Similarly, § 253b(m) bars disclosure of certain contractor proposals. Its first subsection provides that "[a] proposal in the possession or control of an executive agency may not be made available to any person under section 552 of Title 5." However, subsection (2) carves out a large exception, namely "any proposal that is set forth or incorporated by reference in a contract entered into between the agency and the contractor that submitted the proposal." A "proposal" is defined as "including a technical, management or cost proposal submitted by a contractor in response to the requirements of a solicitation for competitive proposal."

Because this statute plainly does not bar disclosure of documents incorporated by reference in awarded contracts, BOP cannot rely on Exemption 3 to withhold that information

from Raher.  Whether BOP has withheld any such documents is unclear.  If it has, then such documents must be released unless protected by some other FOIA Exemption.

Moreover, § 253b(m) does bar disclosure of documents relating to unsuccessful proposals or documents provided by submitters that are not incorporated by reference into awarded contracts.  Since Raher seeks disclosure only of successful proposals, BOP also cannot invoke Exemption 3 to withhold those documents and must rely on one of the other FOIA exemptions.

### 3.  Conclusion

Thus, Raher is granted summary judgment as to Exemption 3.

### B.  Exemption 7

FOIA Exemptions 7(E) and (F), 5 USC § 552(b)(7)(E) & (F), exempt from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information  . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.

The threshold issue for invoking these exemptions is whether the agency involved is properly classified as a "law enforcement" agency.  The term "law enforcement purpose" has been construed to require an examination of the agency itself to determine whether it may exercise a law enforcement function.  *Irons v. Bell*, 596 F2d  468, 474 (1st Cir 1979).  An agency which has a clear law enforcement mandate, such as the FBI, need only establish a "rational nexus" between enforcement of a federal law and the document for which an exemption is claimed.  *Id* at 472.  However, an agency which has a "mixed" function, encompassing both

administrative and law enforcement functions, must demonstrate that it has a purpose falling

within its sphere of enforcement authority in compiling the particular document. *Id* at 473. *See*

*also Weissman v. Cent. Intelligence Agency*, 184 US App DC 117, 565 F2d 692 (DC Cir 1977).

BOP baldly asserts that it is a law enforcement agency. As support, it states that BOP

employees "possess the authority to make arrests," "seize evidence," and "execute searches on

inmates and visitors to the institution," that it "is tasked with the law enforcement mission of

protecting inmates, staff and the community," and that "[a]s such, the files pertaining to

procurement of private correctional services are essential to BOP staff." Second Supp. Tufte

Decl. (docket # 65), ¶ 9. It further claims that "[t]he records at issue were compiled for law

enforcement purposes during the course of procurement of private correctional contracts in order

to perform its law enforcement functions of protecting inmates, staff and the community." *Id.*

Prior to *Milner*, other courts found BOP to be a law enforcement agency. *See Jordan v.*

*U. S. Dep't of Justice*, 2009 WL 2913223 (D Colo Sept. 8, 2009)*; Butler v. Federal Bureau of*

*Prisons*, 2005 WL 3274573 (D DC Sept. 27, 2005). However, in his concurring opinion in

*Milner*, Justice Alito discussed whether the Navy was a law enforcement agency under

Exemption 7. He clarified that "the phrase [compiled for law enforcement purposes] reasonably

encompasses information used to fulfill official security and crime prevention duties." *Milner*,

562 US ___ , 131 S Ct 1259, 1272 (2011). Law enforcement purposes "includes not just the

investigation and prosecution of offenses that have already been committed, but also proactive

steps designed to prevent criminal activity and to maintain security." *Id*. "Similarly, a law-

enforcement agency is charged with the apprehension of alleged offenders as well as crime

detection and prevention." *Id* (citations omitted).

Nothing in the record reveals that BOP has any apprehension, crime detection or crime prevention duties beyond its custodial duties. Therefore, after *Milner*, it is unclear whether BOP still qualifies as a law enforcement agency. However, BOP's primary purpose is to maintain security by housing prisoners, some of whom have been convicted of violent crimes. At best, BOP has both administrative and law enforcement functions and, thus, must demonstrate that each withheld document was compiled for law enforcement purposes.

### 1. Exemption 7(E)

BOP cites Exemption 7(E) for "law enforcement procedures and guidelines listed in the technical proposal records" for CAR Phases 5 and 6 with the following explanation:

> The technical proposal records contain staffing patterns, institution operations, offender accountability techniques, emergency plans, physical plant details, architectural floor plans, architectural drawings, detention doors and lock schedules, manufacturing data, security hardware schedules, key descriptions, security electronics, secure ceiling plans, and facility compliance information. These are records pertaining to the ability of the submitters to house criminals and carry out the mission of the [BOP] and their law enforcement ability to protect the public. The internal practices and procedures were shared with the BOP in order to assess whether or not they can effectively carry out the law enforcement activities tasked to this agency and the private correctional facility.

Third SVI, pp. 6, 12, 18, 23, 28, 33.

BOP also cites Exemption 7(E) for the following three categories of records in the technical proposals:

> Institution Operations [which] contain detailed description of inmate accountability techniques, emergency plans, key control, transportation, collection and dissemination of intelligence information and security inspection systems . . .
> Contract Activation [which] contain human resources details on the staffing plans, blue prints of the facility, project coordinator, and training schedule for policy and procedures. . . .

> Physical Plant [which] provide details of the facility's design and
> location, functional spaces, architectural plans and blue prints.

*Id*, pp. 7, 13, 19, 29, 34.

Mike Prater, a computer services administrator for BOP, addresses the "Information Systems Equipment" section regarding computer networking requirements withheld in CAR Phases 1, 2, 5, and 6. Prater Decl., ¶ 3. The Third SVI does not refer to "Information Systems Equipment," but the court assumes that Prater is referring to withheld information described in the Third SVI as "security electronics" and the "security inspection system." Prater explains that the infrastructure equipment identified in the withheld documents, if released, would allow unauthorized access to the Department of Justice JUTNet and threaten security. *Id*, ¶ 5. Further, "[a]n inmate could do more damage with electronic access to our network than if he were given a key to unlock the doors. If someone were to gain unauthorized access to our electronic network databases, he or those in the public, could alter his release date by changing jail time credit information, access information on his separatees, [and] access sensitive information on staff." *Id*, ¶ 6.

Thomas Smith ("Smith"), Assistant Correctional Services Administrator for BOP, addresses staffing patterns. He explains that its release would expose "potential areas of staffing vulnerabilities, such as post coverages and/or departmental staffing strengths which could help effectuate escapes, assaults, contraband introduction, and other criminal activities." Smith Decl., ¶ 3. "In order for [BOP] to be able to secure these criminals and ensure the safety and security of the public, we must have internal procedures for security of our control centers, transporting prisoners, [and] defensive equipment maintained in a correctional facility." *Id*, ¶ 4.

Although BOP has shown that disclosure of information pertaining to "security electronics, "security inspection system," and staffing vulnerabilities raises security concerns with respect to its custodial functions, it has submitted nothing to explain why the withheld documents pertain to law enforcement functions that are protected from disclosure under Exemption 7(E).

Assuming that BOP qualifies as a law enforcement agency and compiles the requested records for the law enforcement purpose of maintaining security, it must still show that the withheld records are techniques, procedures or guidelines for "law enforcement investigations or prosecutions" covered by Exemption (7)(E). None of the descriptions of the withheld information in the Third SVI or supporting declarations come close to making this showing. Thus, Raher is granted summary judgment as to Exemption 7(E).

## 2.  Exemption 7(F)

BOP cites Exemption 7(F) to protect the following information "used for protection of law enforcement" in the technical proposal records for CAR Phases 5 and 6:

> . . . physical plant details, staffing patterns, institution operations, offender accountability techniques, emergency plans, architectural floor plans, architectural drawings, detention doors and lock schedules, manufacturing data, security hardware schedules, key descriptions, security electronics, and secure ceiling plans. Release of this law enforcement information would disclose highly sensitive building physical structures [which] would seriously jeopardize the safety and security of inmates, staff and the public. Portions of records withheld from plaintiff describe the intricate details of the prison physical structure. Detailed knowledge of this information would allow individuals to manipulate conditions, maneuver undetected, or damage correctional security devices in order to facilitate escapes, assaults, or disturbances. Disclosure of internal emergency plans, and institution accountability techniques could potentially further the criminal activities of inmates by providing them information that would allow them to change their activities to avoid detection by correctional staff. Release

of this information will create a threat to the good order, discipline, and security of these prisons.

Third SVI, pp. 6, 12, 18, 23, 28, 33.

BOP also cites Exemption 7(F) (in addition to Exemption 7(E)) for the category of records in the technical proposals described as "Physical Plant [which] provide details of the facility's design and location, functional spaces, architectural plans and blue prints." *Id*, pp. 7, 13, 19, 29, 34.

According to Smith, BOP:

> does not release to the public our physical security plans, blue prints, architectural floor plans, door and key lock specifications, ceiling plans, and any information on the internal physical structure of a BOP correctional facility.  Release of this type of information to the public, or to inmates, would seriously jeopardize the secure confines of these facilities.  By releasing this type of information, inmates would be able to locate internal crawl spaces, venting spaces, door, wall and window dimensions, electronic security device locations, etc. and thus, would facilitate escapes, disturbances, and destruction of government property.  Release of such information could lead to circumventing law enforcement efforts aimed at preventing escapes, and maintaining secure and safe correctional facilities.

Smith Decl., ¶ 5.

Raher does not contest that disclosure of much of this information, such as details of the prisons' internal physical structure and internal emergency plans, could reasonably be expected to endanger the life and physical safety of the prison staff.  However, BOP does not explain, and it is far from clear, how other withheld information, namely "staffing patterns," "institution operations," "offender accountability techniques," and "institution accountability techniques," raise any security concerns.  Any inmate or visitor to a BOP facility is able to observe "staffing patterns" and certain "institution operations."  In fact, BOP publishes many of its internal

policies pertaining to institutional security and inmate programs and services in full on its

publicly accessible webpage.  Fourth Raher Decl. (docket # 97), ¶ 3 & Exs. C & D.   BOP has not

bothered to describe "offender accountability techniques" or "institution accountability

techniques" and those phrases convey nothing about security concerns.  In sum, the categories in

the Third SVI are simply too general to allow Raher or this court to test the validity of BOP's

redactions under Exemption 7(F).  The problem is exacerbated by the lack of any showing by

BOP of a good faith effort to redact *bona fide* security information and to disclose "[a]ny

reasonably segregable portion of a record . . . after deletion of the portions which are exempt."

5 USC § 522(b).  "The 'segregability' requirement applies to all documents and all exemptions in

the FOIA." *Center for Auto Safety v. Envtl. Prot. Agency*, 731 F2d 16, 21 (DC Cir 1994)

(rejecting mandatory *in camera* inspection by the court).

Accordingly, BOP may rely on Exemption 7(F) to withhold information in the technical

proposals for CAR Phases 5 and 6 pertaining to physical security plans, blue prints, architectural

floor plans, door and key lock specifications, ceiling plans, and any information regarding the

internal physical structure of a BOP correctional facility.  However, BOP has not carried its

burden to withhold any other information as described in the Third SVI under Exemption 7(F),

and Raher is granted summary judgment to that extent.  In order to prevent the public release of

potentially damaging information to BOP's security concerns, BOP may release such information

pursuant to a protective order that prohibits disclosure by Raher to anyone else without prior

BOP or court approval.

///

///

19 - OPINION AND ORDER

### III.  Exemption 4

BOP invokes FOIA Exemption 4 to justify withholding information in the:  (1) initial

Vaughn Index for pricing information in various awarded contracts; (2) First SVI for pricing

structure and other information in the proposal records for the successful bidders on CAR

Phases 5 and 6; (3) Second SVI for BOP's internal price evaluation and source selection decision

records regarding CAR Phases 5 and 6; and (4) Third SVI for the past performance and technical

proposal records of the successful bidders on CAR Phases 5 and 6 (duplicative of 12 documents

in the First SVI).

Exemption 4, 5 USC § 552(b)(4), protects from disclosure "commercial or financial

information obtained from a person [that is] privileged or confidential."  Such information falls

within Exemption 4 if disclosure would either lessen the likelihood of future voluntary sharing of

similar information by similar sources or cause substantial harm to the competitive position of

the submitter of the information.  *Frazee v. U. S. Forest Serv.*, 97 F3d 367, 371 (9th Cir 1996)*;*

*GC Micro Corp. v. Def. Logistics Agency*, 33 F3d 1109, 1113 (9th Cir 1994), adopting *National*

*Parks & Conservation Ass'n v. Morton*, 498 F2d 765, 770 (DC Cir 1974) ("*National Parks I*").

If the withheld information was provided voluntarily, then the government has an interest

in protecting confidentiality to ensure that similar sources of information will cooperate and

provide similar information in the future.  As this court previously concluded, the submitters did

not voluntarily provide information to BOP, but instead provided it as a mandatory requirement

of compliance with the CAR procurement process.  O&O, p. 10.  Thus, "there is presumably no

danger that public disclosure will impair the ability of [BOP] to obtain this information in the

future."  *National Parks I*, 498 F2d at 770.

Since the submitters are mandated to provide the information to BOP, the only issue is whether the disclosure is likely to cause substantial harm to the competitive position of the providers of the information. *McDonnell Douglas v. U. S. Dep't of the Air Force*, 375 F3d 1182, 1187 (DC Cir 2004); *National Parks I*, 498 F2d at 770. The person seeking to withhold the information must establish both actual competition in the relevant market and a likelihood of substantial competitive injury if the information is released. *Lion Raisins v. U. S. Dep't of Agric.*, 354 F3d 1072, 1079 (9th Cir 2004); *GC Micro Corp.,* 33 F3d at 1112-13.

In responding to the FOIA requests, BOP reviewed the identified documents and removed information believed to be exempt. Tufte Decl. (docket #18), ¶¶ 11, 16; Suppl. Tufte Decl. (docket #30), ¶ 3. The redacted records were then sent to the submitters informing them of the FOIA request and advising them that if they did not object in writing to the release of the redacted records, they would be sent to the requester. Tufte Decl., Exs. D (June 22, 2009) & E (October 13, 2009); Supp. Tufte Decl., ¶ 3. BOP received oral and written objections, including a renewed written objection that CCA had previously submitted to a previous FOIA request for the awarded contract. Tufte Decl., ¶¶ 12, 17; Supp. Tufte Decl., ¶ 3 & Ex. 1. The record is not clear which submitters (other than CCA) made objections, when or how. In any event, Raher claims that BOP cannot withhold information from those submitters who failed to object in writing to the release. However, the lack of objection by any submitter can only be interpreted to mean that they concurred with BOP's proposed redactions. Moreover, if any submitter establishes the existence of substantial competitive harm from a release of certain information, then all of its competitors, who are required to submit the same categories of information to BOP, would be similarly affected by a release of their information. If BOP withheld information

from one submitter, but released similar information submitted by its competitor, then it would face a serious risk of a reverse FOIA action. Accordingly, BOP may invoke Exemption 4 as to information received from all five submitters despite the lack of objection by some of them.

### A. **Actual Competition**

#### 1. **Competitors in the Market**

The court previously found that BOP had failed to show actual competition based, in part, on a lack of competitors in the market:

> BOP is the only customer in the relevant market, and the submitters are among a small number of entities, perhaps the entire universe of such entities, that meet the solicitation criteria for the CAR procurement process and are capable of supplying BOP with the facilities and services required. The procurement process imposes barriers to entry for new competitors in the market. The CAR solicitations are open only to contractors with existing facilities which necessarily limits the universe of competing bidders to prison operators with excess capacity in existing facilities. In addition, the solicitation criteria require each bidder to establish that it has performed similar contracts within the preceding three years, further impeding new competitors from entering the relevant market.

O&O, p. 11.

In response, BOP has submitted two declarations. Matthew Nace, BOP's Chief of Acquisition Branch, explains that BOP has 13 CAR contracts and solicits and awards follow-on contracts to ensure continuity of service. Nace Decl., ¶ 4. Nace asserts that the market has grown "three times" since BOP initially entered into privatization from approximately three competitors to "multiple competitive proposals from 5-6 providers" and "as many as 15 responses to one private prison solicitation." *Id*, ¶ 5. In addition, Cole Carter, CCA's assistant general counsel, explains that many local governments also compete with private prison companies for contracts with BOP. Carter Decl., ¶ 7.

However, the fact that BOP received 15 responses to any one CAR does not establish that 15 different prison companies compete in the market. As explained by Kenneth Kopczynski, the Executive Director of the Private Corrections Working Group (a non-profit organization that monitors developments in the private prison industry), only eight private sector entities provide contractor-owned, secure adult private-sector corrections facilities within the relevant market. Kopczynski Decl., ¶ 3. GEO Group and CCA dominate the market, with GEO Group holding 47% and CCA holding 35% of the 23,970 secure facilities beds under contract with private providers. *Id*, ¶ 4. Thus, it appears that some of the 15 responses referred to by BOP include proposals submitted in the name of local governments with facilities operated by one of the eight private companies, such as the Reeves County/GEO Group proposal.

As further evidence of actual competition, CCA points out that BOP is not the only customer in the market because private prison services are procured by other federal agencies, including Immigration and Customs Enforcement, Office of Federal Detention Trustee, and the United States Marshals Service ("USMS"). *Id*, ¶ 9. In one instance, the USMS used CCA's California City Correctional Center facility for federal detainees after CCA lost a contract with BOP for this facility. *Id*, ¶ 9.

In response, Raher has submitted a declaration from Bryce Ward ("Ward"), an economist.[1] Ward points out that BOP has not provided a formal market analysis that adequately

---

[1] GEO Group asks the court to exclude Ward's declaration because: (1) Raher failed to make an expert disclosure under FRCP 26(a)(2); (2) most of Ward's opinions constitute improper legal analysis and conclusions of law; and (3) Ward's opinions are based on unfounded assumptions and utilize unreliable methodologies. These arguments are meritless. This court has not yet set a deadline for filing expert disclosure statements, and Ward's opinions are fully supported and admissible under FRE 702. Alternatively, if the court considers Ward's testimony, GEO Group requests a stay under FRCP 56(d) to allow expert-related discovery. That request is denied because it was not filed as a separate motion as required by LR 7-1(b) and because expert discovery is unnecessary at this

(continued...)

defines the relevant market, but, at most, "alludes to substitution possibilities for sellers and

buyers." Ward Decl., ¶ 11. BOP has neither submitted "a specific list of facilities that

potentially could compete for the CAR series contracts" nor described "the set of buyers who

would willingly contract with a CAR eligible facility (without significant modification)." *Id*,

¶ 12. If non-trivial accommodations or changes were necessary, then the situations described by

Carter "are not evidence that suppliers of CAR prisons can seek out alternative buyers for their

facilities in the relevant market." *Id*, ¶ 13.

To show that the "corrections industry is highly competitive," GEO Group has submitted

the declaration of Kyle Schiller ("Schiller"), its Vice President of Operations/Administration.

Schiller Decl., ¶ 8. First, Schiller argues that "significant and risky capital expenditure" creates

competition in the market. *Id*, ¶ 9. Because many corrections contracts only allow bidders to

propose existing facility capacity, the bidders must build new facilities or expand existing ones in

order to remain competitive. *Id*. "While this might be seen as a barrier to entry that would

reduce competition, it in fact amplifies competition because the construction or expansion of a

facility involves significant risk thereby amplifying the competitive environment." *Id*.

How Schiller concludes that a cost barrier to entry in a market amplifies competition is

indeed puzzling. Perhaps there is a keen competition between the companies already in the

market, but a significant cost barrier clearly exists to new companies seeking to enter the market.

Schiller himself states that each contractor-owned facility can cost upwards of $100 million to

construct. *Id*, ¶ 16. He does not explain how small qualified companies without the necessary

---

[1](...continued)
juncture based on this court's ruling on Exemption 4.

financial resources to create excess capacity in an existing or new facility would easily enter the corrections market.  Furthermore, Schiller does not show that submitters face day-to-day competition from businesses offering similar services.  *See* O&O, p. 13; citing *National Parks & Conservation Ass'n v. Kleppe*, 547 F2d 673, 682 (DC Cir 1976) ("*National Parks II*") (concessioners within the national parks showed actual competition with hotels, restaurants, and gas stations in towns near the national parks).

Schiller also points to government owned contractor operated ("GOCO") contracts, the strategy of underbidding, special requirements for specialized vendors, and long-term contracts. Schiller Decl., ¶¶ 10-13.  None of these factors, however, shows actual competition.  Instead, they primarily describe competition among the small submitters.  If anything, GOCO contracts weigh against competition.  The increased number of submitters does not necessarily reflect new companies competing, but rather existing companies partnering with local governmental entities. In essence, they only increase their chances of winning the award by increasing their number of bids.

Lastly, GEO Group asserts that its 2010 merger with Cornell proves actual competition as a matter of law due to the requirements of the Hart-Scott-Rodino Antitrust Improvement Act of 1976, 15 USC § 18a.  Without submitting any supporting evidence, GEO Group represents that the proposed merger obtained clearance from the Federal Trade Commission and the United States Department of Antitrust Division.  However, even assuming the truth of this representation, the merger is not conclusive of competition since it "does not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of laws."  18 USC §18a(i)(1).

Thus, the record continues to show only that a small number of entities meet the solicitation criteria for the CAR procurement process and are capable of supplying BOP with the facilities and services required.

## 2. **Competition in the Procurement Process**

Given the small number of qualified bidders, the court also asked BOP for evidence that the CAR procurement practice was competitive in practice:

> The [First SVI] identifies the proposals BOP received in response to CAR Phases 5 and 6, and the Vaughn Index identifies all the contracts resulting from those solicitations.  Together they demonstrate that BOP awarded a contract for each bid it received. . . . BOP has not shown that there were any unsuccessful bidders, that the submitters bid against each other, or that unidentified potential contractors exist that could compete in the CAR procurement process.

O&O, p. 12.

In response, BOP has submitted evidence that not all bidders are awarded contracts. Although CAR Phase 6 was awarded to more than one bidder, CAR and similar contracts are normally awarded to only one bidder.  Nace Decl., ¶ 19.  CAR Phase 1 was awarded to two out of four bidders; CAR Phase 2 was awarded to one out of seven bidders; CAR Phase 5 was awarded to one out of five bidders; and CAR Phase 6 was awarded to each of the five bidders. *Id*.  However, BOP does not address the other eight CAR Phases and does not reveal the quantities of prison beds awarded.  GEO Group adds that CAR Phases 5 and 6 awarded all the beds solicited, while CAR Phase 1 did not, and that CAR Phases 2, 3, and 9 were cancelled. Schiller Decl., ¶ 15.

CCA offers similar evidence that it has not won contracts each time it has bid, although it participated in the majority of BOP's CAR solicitations.  Carter Decl., ¶ 10.  For CAR Phase 5,

CCA proposed three facilities of the seven total proposals, but Reeves County (GEO Group) won

the contract; for CAR Phase 6, CCA was awarded a contract along with four other competitors;

for CAR Phase 7, CCA competed with two other companies but lost the bid; and for CAR

Phase 10, CCA lost the entire BOP population to Cornell.  *Id*, ¶ 8.  GEO Group explains that

CAR Phase 6 appears to be less competitive because of political pressure at that time to expand

criminal alien detention, resulting in a demand for bedspace with higher than usual funding for

procuring this bedspace.  Schiller Decl., ¶ 17.

CAR procurements can also shift between different companies.  When CCA's CAR

Phase 1 contract for two facilities expired, it was re-bid as CAR Phase 10, and CCA lost one of

the facilities to a Cornell facility. Schiller Decl., ¶ 16.  Similarly, GEO Group lost to MTC the

CAR Phase 7 contract, a re-bid of its expired contract.  *Id*.

While this evidence shows that not all bidders are guaranteed a CAR contract, it also

shows that in more than one instance, several bidders were awarded contracts for a single

solicitation.  Ward concludes that "the existence of rejected submissions suggests that

competition for some CAR contracts exists," but "at times, BOP may award CAR contracts

based on an apportionment among firms that submitted bids, rather than on competition among

bidders."  Ward Decl., ¶ 14.

Missing from the record is the number of total beds bid and awarded which would be

more helpful in determining the existence of actual competition.  BOP awards contracts for a

certain number of beds and often in certain geographical areas.  However, it has not released the

total number of beds awarded to each bidder and how that compares to the bidder's available

capacity.  Given that bidders must have existing facilities with available beds, Raher suspects

that BOP awards contracts based on capacity, not on competitive pricing.  However, Ward

concedes that, "[a]ssuming that most of the submitters met BOP requirements and that BOP

awarded the contract based on fair consideration of each submission, this suggests that there may

be competition in the relevant market (although the market may not be competitive in a strictly

economic sense.)"  *Id.*

### 3.  Competition in the Contract Renewal Process

This court also noted that the prior record lacked a showing of actual competition in the

contract renewal process:

> The record contains no evidence showing that submitters have been
> underbid by competitors in the renewal process or that BOP has declined
> to exercise the option year for any existing CAR contract. . . .  There is no
> persuasive evidence that BOP considered competing bids when
> determining whether to exercise its option to renew an expiring CAR
> contract.

O&O, p. 12.

GEO Group now offers examples of non-renewals of expiring CAR contracts.  CCA, its

competitor, lost in the rebidding of CAR Phase 10 in 2009.  Schiller Decl., ¶ 16.  GEO Group

lost the rebid of CAR Phase 7 to MTC, another competitor.  *Id.*  For this solicitation, Schiller

states that "[a]s a GOCO, CAR [Phase] 7 reflects the potential competitive harm from smaller

competitors, such as MTC, that can use GEO's staffing plans and other operational approaches to

undercut GEO's proposed cost."  *Id.*

### 4.  Conclusion

Only a small number of existing submitters are qualified, available, and capable of

providing secure detention facilities and services to BOP.  However, as conceded by Ward, the

record "supports the conclusion that prison operators compete in the relevant market, at least

some of the time" for CAR contracts and renewals.  Ward Decl., ¶ 6.  Thus, BOP has met its

burden of showing the existence of actual competition as required by Exemption 4.

    **B.  <u>Substantial Harm</u>**

Exemption 4 also requires BOP to show a likelihood of substantial competitive harm to

any submitter if the withheld information is released.  BOP is not required to demonstrate with

certainty that disclosure of the information would cause substantial competitive injury to the

submitter of the information, but need only demonstrate that disclosure would be likely to do so.

*McDonnell Douglas*, 375 F3d at 1187, citing *National Parks I*, 498 F2d at 770.  "[I]information

will result in substantial competitive harm if it 'would allow competitors to estimate, and

undercut, [the firm's] bids.'"  *GC Micro Corp.*, 33 F3d at 1115, quoting *Gulf & Western Indus.,

Inc. v. United States*, 615 F2d 527, 530 (DC Cir 1979).  When "the data is made up of too many

fluctuating variables for competitors to gain any advantage from the disclosure," it "is unlikely to

work a substantial harm on the competitive positions of defense contractors."  *Id*.

The court previously determined that BOP had not shown substantial harm because it

provided no explanation of how competitors could use information from past or existing

contracts to successfully underbid in the future.  "Disclosure of the contractor's overall bid price

from a past or existing contract would not provide an adequate basis to predict future bids

without information showing how the contractor arrived at the overall price."  O&O, p. 16.

"Unless BOP can provide more specific evidence regarding each redaction and explain how a

competitor could use the redacted information to inform its bidding in future competition for

similar contracts, the alleged harm appears to be no more than a theoretical possibility."  *Id*,

p. 17.

The court also determined that BOP had failed to show how disclosing option pricing information would lead to harm in the CAR bidding process. While "disclosure of option year pricing terms, or information from which the option year prices could be determined, would enable competitors to induce BOP to forego its option to extend the contract and then undercut the current contractor's option price when BOP opens the contract to new bidding," BOP did not demonstrate that the theoretical harm was likely. *Id*, p. 18. The court concluded that "the likelihood that BOP would decline to exercise an option in favor of a lower price is diminished by its need for continuity of operations and the significant costs of disruptions in continuity." *Id*, citing 48 CFR § 17.207 (requiring contract officers deciding whether to exercise an option to consider the agency's need for continuity of operations and the costs of disrupting operations).

The Second and Third SVIs provide more detailed explanations than did the First SVI for withholding information related to CAR Phases 5 and 6 under Exemption 4. The Second SVI withholds "Internal Price Evaluation and Source Selection Decision information" because "[r]elease of such pricing information would cause substantial harm to the competitive position of the submitter on future bidding and would reveal elements crucial in determining the submitters pricing structure." The Third SVI withholds all or part of 12 documents described as either "Past Performance" or "Technical Proposal" records (also withheld in the First SVI, but without citing any FOIA exemption) because:

> Release of such pricing information would cause substantial harm to the competitive position of the submitter on future bidding; would reveal elements crucial in determining the submitters [sic] pricing structure; and would undermine the future competitiveness of these contracts in the best interest of the government and tax payers, particularly in the realm of cost savings. Release of this information would seriously compromise the integrity of future solicitations by creating an unlevel playing field. If a submitter's past performance information was released, competitors could

use that information to change their bid accordingly.  If a submitter has poor past performance and a competitor has good past performance, the competitor would know the submitter must adjust their pricing to overcome the lower aspect of past performance in the evaluation scoring. Thus competitors would know to alter their pricing to underbid the submitter.

Third SVI, pp. 3, 6, 9, 12, 15, 18, 21, 23, 26, 28, 31, 33.[2]

### 1.  BOP Generated Records (Second SVI)

The Second SVI withholds evaluation and source selection decision information generated by BOP.  The submitters' proposals include "Past Performance" records, the majority of which describe their past performance history with previously awarded contracts with both BOP and other entities.  Nace Decl., ¶ 10.  BOP uses this information only for source selection purposes.  *Id*.  The BOP contracting officer develops a Past Performance Evaluation score to evaluate bids for each offeror based on past performance information submitted in the solicitation process.  *Id*, ¶ 11.  Only federal agencies can obtain the past performance score, and contractors may obtain only their score, not another competitor's score.  *Id*.  BOP claims that these records are protected from disclosure under FARs 3.104-4 and 15.306 and fears that "[f]uture submitters could circumvent our regulations, if they were provided with this sensitive evaluation information/source selection information and would compromise the integrity of our solicitation by creating an unlevel playing field."  *Id*.

The "Past Performance" records also contain questionnaires completed by the contracting officer for internal decision-making only.  *Id*, ¶ 12.  They contain "frank and candid evaluations of the submitter's performance."  *Id.*

---

[2] Some references contain a shorter version of this explanation.

However, the Past Performance Scores and questionnaires were not "obtained from a person" as required by Exemption 4. 5 USC § 552(b)(4). FOIA defines a "person" to include "an individual, partnership, corporation, association or public or private organization other than an agency." 5 USC § 551(2). "'[Courts] have read the requirement that information 'be obtained from a person' to restrict the exemption's application to data which have not been generated within the Government.'" *Bloomberg L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F3d 143, 148 (2nd Cir 2010), citing *Board of Trade v. Commodity Futures Trading Comm'n*, 627 F2d 392, 403-04 (DC Cir 1980). An agency's own executive actions are not covered by Exemption 4. *Id* at 148-49.

Therefore, BOP cannot rely on Exemption 4 in the Second SVI to categorically exempt all internal price evaluation and source selection decision records which it generated for the purpose of evaluating bids. Instead, Exemption 4 only protects information contained in those records that was obtained from the submitters, disclosure of which will cause them substantial competitive harm.

### 2. Public Documents

Raher argues that GEO Group cannot assert Exemption 4 for documents that are available under state law because there they are not confidential. In fact, others have successfully obtained documents from Reeves County which BOP refuses to release to Raher. *Compare* Second Raher Decl., Ex. O, *with* Barry Decl. (docket #36), Ex. A (unredacted Reeves County's CAR Phase 5 contract with BOP).[3] Reeves County also has released information detailing its profit margin

---

[3]  Reeves County is contesting an opinion by the Attorney General for the State of Texas which required the release of inmate medical complaints; the Attorney General did not require release of Reeves County's contracts with

(continued...)

information that BOP refuses to disclose.  Barry Decl., Ex. B (Reeves County's 7/31/2006

management contract with GEO Group).  In addition, compensation information for non-

management staff who are Reeves County employees is subject to disclosure under Texas Law.

Raher Decl., Ex. A, § 3.02, p. 18; Ex. B, p. 18.

 GEO Group asserts that if Raher wants these documents, then he must seek them from

Texas.  However, GEO Group misses the point.  The fact that the documents are subject to

disclosure under Texas law by definition renders them not confidential for purposes of

Exemption 4.  Thus, Exemption 4 does not protect from disclosure any information that has been

or must be disclosed pursuant to any state law or that otherwise is "freely or cheaply available

from other sources."  *GC Micro Corp*., 33 F3d at 1112 n3, quoting *Worthington Compressors,*

*Inc. v. Costle*, 662 F2d 45, 51 (DC Cir 1981).

 It is not clear, however, which documents BOP is withholding under Exemption 4 that are

otherwise publicly available other than those already obtained by Raher (Reeves County's CAR

Phase 5 contract with BOP, as well as Reeves County's contracts with BOP from 2003 to 2009).

In fact, BOP is likely unaware of what requested documents have already been disclosed by

Texas and other public entities.  Simply because Raher has obtained some documents from

elsewhere does not necessarily mean that BOP is required to release all other documents in its

possession that contain similar information.  This is not the same situation as in *Frazee*, 97 F3d

at 369-70, where most of the information contained in the operating plan for managing two

recreational facilities was publicly available from/or was taken directly from the agency's

---

[3](...continued)

BOP from 2003 to 2009 which had already been released without objection.  Third Raher Decl., Exs. F & G.

solicitation, its guidebook or from other sources.  In contrast, the information at issue here

becomes publicly available only when requested and released by some other entity.  To obtain

disclosure of any other documents not already obtained elsewhere, Raher must submit additional

evidence conclusively establishing that those documents are "freely and cheaply available from

other sources."  The current record is not sufficient to meet that test.

### 3.  Pricing Structure

BOP has released the final awarded contract price as required under various FARs, but

not the number of beds or the pricing structure because it "would cause substantial harm to the

competitive position of the submitter on future bidding and would undermine the future

competitiveness of these contracts."  Nace Decl., ¶ 8.  This position applies both to the awarded

contracts and the proposals from successful bidders.

The pricing structure is quite complicated.  For the base period and for each option year,

the total price includes a monthly operating price ("MOP") for inmates up to 90% of the number

of contract beds and a fixed incremental unit price ("FIUP") per inmate day for inmates above

the MOP up to 115% of the number of contract beds.  The FIUP applies when the average

number of inmates, in a monthly payment period, exceeds 90% of the contract beds.  As

explained in a contract awarded by BOP to Reeves County:

> First, figure the number of inmates for the FIUP.  For 1,000
> contract beds offered at 100%, in the 90% schedule, the FIUP
> percentage up to 115% would be 250 contract beds (1150-900).  If
> the FIUP per inmate day is $10, then the FIUP for one year would
> be $10 x 250 x 365 = $912,500.

Barry Decl., Ex. A, p. 8.

The total contract price also includes a monthly ramp up price for inmates up to 50% of the number of contract beds for those facilities without an existing BOP population.

CCA does not object to BOP's disclosure of the total contract price, but does object to disclosure of "various other categories of pricing, such as incremental unit prices ("FIUP") and ramp up pricing." Carter Decl., ¶ 16. Although the "fundamentals of correction and detention pricing are well known to competitors," BOP "requires bidders to submit a detailed schedule of pricing details." *Id*. In particular:

> [FIUP] are offered to the government on a per prisoner per day basis. [It] represents the cost of housing each additional prisoner at a given facility once a certain population threshold is reached. Because this element of pricing is designed to allow the federal user of the facility to take advantage of economies of scale once a threshold level of use is exhausted, the revelation of this price, combined with the estimated total contract value, which is already revealed, would allow CCA competitors to derive the cost per prisoner regardless of the population size simply by reverse engineering various configurations.

> Similarly, ramp up prices reveal the per prisoner per day price at various stages of activation of a facility. As with incremental pricing, these prices reveal by basic mathematics the cost per prisoner that CCA offers at specific population levels. Ramp-up prices are based on formulas that are readily ascertainable by firms engaged in the work of corrections and detention services.

*Id*.

CCA "developed its pricing formulas at great expense and through years of experience and refinement," such that disclosure would allow a "competitor to shortcut CCA's development and compete unfairly" when combined with already publicly available information. *Id*. However, CCA does not quantify the time and expense incurred to develop its pricing formulas or explain how disclosure would cause competitive harm specifically to CCA.

35 - OPINION AND ORDER

CCA also claims that option pricing disclosure would provide competitors at the state, local and federal levels with "information that would allow them to underbid CCA or replicate CCA's confidential and unique proposals." *Id*, ¶ 11. Revelation of prices for the optional renewal terms would allow competitors "to underbid CCA's already contracted option price with certainty should the BOP decide to consider competitor bids in lieu of renewing a contract with CCA." *Id*, ¶ 13. Although BOP has never declined to exercise a contract with CCA, CCA offers examples of how this could happen in "other comparable procurement environments." *Id*. In 2008, the Florida Department of Management Services submitted the facility's operation to re-competition through rebid. *Id*. CCA prevailed in the recompetition, but "facility employees were forced to go through the uncertainty of a lengthy rebid process." *Id*. "Had CCA revealed its option year pricing . . . CCA would be forced to compete against firms that already knew CCA's option price and could underbid CCA's originally contracted price prospectively." *Id*. Moreover, BOP may enter into agreements with state and local governments without relying on a competitive procurements process, giving it "wide latitude in shifting the location of a population from a CCA facility to another facility rather than renewing a contract." *Id*, ¶ 14.

GEO Group similarly states it has invested resources in proprietary business models including staffing, vendors and service providers, equipment purchases and leases, maintenance costs, pricing methodology, and facility design and construction. Schiller Decl., ¶ 21. Although it, too, fails to quantify the time and expense incurred, it does offer some specific explanations of how disclosure would cause competitive harm.

According to GEO Group, revealing staffing information would give its competitors "significant flexibility as to the specific types of positions to perform contract requirements and

the number of people hired for each position" and "undercut the number of people for a particular position." *Id*, ¶ 24. Disclosure of the Shift Schedules and Activation Schedules "present a particular risk of competitive harm because they are premised on formulas with variables set by the offeror[, thus] enabling one offeror to undercut another in a very precise manner." *Id*. Those variables are not identified. However, GEO Group states that the "key" variable for the Shift Schedules is the "relief factor" which is "the ratio or percentage by which the base staffing number for a given position is multiplied to ensure there is sufficient additional staff to cover individuals being unable to work." *Id*. In addition, the Activation Schedules show "when and for how long particular staff will start prior to receiving prisoners at a facility" for which the key variables are "the start point and duration for each position type." *Id*, ¶ 25. Disclosure of this information "would allow a competitor to strategically choose to undercut the activation or start-up period for a particular type of staff, thus undercutting the offeror's per diem rate." *Id*. Dot diagrams ("visual representations of staffing plans and shift schedules") pose similar risks for use by competitors. *Id*, ¶ 26. The Department of Labor sets the wage rates for particular job positions which "can be applied to previous staffing information to determine a very accurate estimate of current or future personnel costs, which can be used to undercut new proposals." *Id*, ¶ 27.

GEO Group also expresses concern about disclosing information relating to its subcontracts with vendors, service providers, and equipment providers. They are "predominantly long-term contracts which cannot be changed or terminated easily" to mitigate competitive harm from disclosure. *Id*, ¶ 28. If a competitor knows that equipment is purchased, as opposed to leased, "that will incur a fixed cost until the item is fully depreciated, they can adjust their

proposals accordingly." *Id*, ¶ 29.  GEO Group contends that disclosure of maintenance costs, pricing methodology and facility design and construction similarly would allow competitors to undercut its bids.  *Id*, ¶¶ 30-33.

Ward challenges CCA's and GEO Group's claims as failing to provide a formal market analysis that defines the relevant market and failing to assess if a competitive process determines the outcomes in that market.  Ward Decl., ¶ 7.  He explains that "economists primarily focus on two sources of a firm's competitive advantage – cost and differentiation."  *Id*, ¶ 21.  A firm can obtain a favorable competitive position either by supplying  "a similar quality product at a lower cost" or differentiating itself from its competitor as by offering a higher quality product.  *Id*. Simply claiming that a release of pricing information will allow competitors to underbid bidders assumes, but does not prove, that competitors can and will change their costs or quality in response and that those changes will affect the outcome of future bidding opportunities.  *Id*, ¶ 22.

Ward posits two illustrative scenarios that may reflect the claim that a release of the successful bidders' pricing structures will allow competitors to underbid them on future contracts.  In one scenario, a competitor has a similar quality to the incumbent and lower costs, but loses because it selected the wrong bid price.  *Id*, ¶ 25.  In the second scenario, a competitor has a similar quality to the incumbent, but loses due to its higher costs.  *Id*.  In both scenarios, Ward explains how "the release of the withheld  pricing information does not have a significant impact on the outcome of future bidding."  *Id*.  Neither BOP nor the submitters has submitted any plausible theory or compelling evidence model that address these scenarios.  Thus, Ward concludes that CCA and GEO Group have not provided "sufficient support to conclude that the

release of pricing information seems likely to substantially affect competitive outcomes." *Id*, ¶ 26.

As summarized by Ward, the problems with the current record are twofold. "First, it is unclear what information would be released that the competitors in the market could not obtain from other sources. Second, the defendants do not clearly explain how the released information would allow firms to improve their competitive positions (*e.g.*, their costs or quality) in ways that they would not if the information were not released." *Id*, ¶ 29. The range of values for many factors considered by BOP, such as the number of people for particular positions and wage rates, is limited. "When a variable can only take a limited range, strategic firms will consider the full set of options and select the optimal value for them. As such, it is not clear how revealing this information would prompt change to competitor staffing choices or relief factors." *Id.*

Based on Ward's cogent analysis, this court has serious doubts about whether disclosure of pricing information would cause substantial harm to any submitter. After all, Raher has obtained several other CCA proposals and contracts with Idaho (Fourth Raher Decl., Exs. F & G), Oklahoma (*id*, Ex. I), and Colorado (*id*, Ex. J), as well as GEO Group/Cornell contracts with Idaho (*id*, Ex. E), Oklahoma (*id*, Exs. H & P), and Colorado (*id*, Ex. K), all of which disclose the number of beds (or inmate capacity) and per diem prices (or daily cost per inmate) and some of which disclose detailed operating costs and staffing patterns. Using those documents and the CAR Phase 6 contract with GEO Group obtained from Texas, Raher has compiled a chart showing the respective per diem rates for certain CCA and GEO Group/Cornell contracts. *Id*, Ex. O. That chart reveals that GEO Group's per diem compensation for the CAR Phase 6 contract is substantially higher than the state per diem rates and that BOP's pricing structure with

a MOP provides a revenue guarantee not found in the state contracts.  Thus, it is unlikely that a

bidder would glean any more helpful information from BOP's disclosure of pricing information

than from disclosure of the state contracts.  Moreover, Raher concludes with some justification

that GEO Group and CCA are using the CAR contracts to cross-subsidize money-losing

contracts with state and local governments which is not the type of substantial competitive harm

protected by Exemption 4.

One major issue underlying the pricing information is the role of fluctuating variables.

BOP and the submitters contend that their major operating cost is labor.  They fear that

disclosure of the type of positions and number of people for each position along with the wage

rates would allow a competitor to undercut the number of people for a particular position and

thus undercut the price.  However, it is far from clear how many of the variables that go into

determining the MOP or FIUP are fluctuating, as opposed to fixed, variables.  It seems unlikely

that a competitor would be able to calculate the profit margin from disclosure of the MOP and

FIUP alone.  *See Pacific Architects & Eng'rs Inc. v. U. S. Dep't of State*, 906 F2d 1345 (9th Cir

1990) (requiring disclosure of hourly charges for maintenance and operations services).  But the

additional disclosure of detailed staffing information may allow such a calculation.  On the other

hand, as posited by Ward, a competitor may not be able to sufficiently manipulate the Staffing

Schedules and Activation Schedules in order to significantly modify the ultimate proposal price

as claimed by GEO Group.  This would be especially true since BOP requires bidders to have

existing facilities where the staffing levels and activation schedules are likely not subject to

significant modification.  In addition, some key variables appear to be fixed, such as the wage

rate for each position which is set by statute and likely is standardized within the industry.  Prices

also may be based on variables that change over time, providing little benefit to future bidding. And, as Raher has shown, much of this information is already available from publicly available contracts with state and local governments.

This court also questions the need to exempt option renewal prices. Automatic and infrequent renewal presents "practical barriers to competition by potential contract bidders," such that disclosure would not be damaging to competition. *National Parks II*, 547 F2d at 682. Although GEO Group states that CCA lost in the rebidding of CAR Phase 10 in 2009, CCA states to the contrary that BOP has never declined to renew its contact. Schiller Decl., ¶ 16; Carter Decl., ¶ 13. If option renewals with BOP are nearly automatic, then Exemption 4 would not exempt related pricing information.

Despite these concerns and deficiencies, the issue at this juncture is whether BOP has submitted sufficient evidence to create a genuine issue of material fact to avoid summary judgment and require an evidentiary hearing. Based primarily on the submission by GEO Group, BOP has created a genuine issue of material fact as to whether a submitter will likely suffer substantial competitive injury if the withheld information is released. *Lion Raisins*, 354 F3d at 1079; *GC Micro Corp.*, 33 F3d at 1112-13. Accordingly, an evidentiary hearing is necessary to determine whether BOP may invoke Exemption 4 to protect pricing information, in particular, activation and staffing schedules and option renewal prices.[4]

Pricing information, however, does not include the number of beds awarded by each contract. Given that qualified bidders must have existing facilities and available capacity, BOP

---

[4] Raher only requests information related to successful proposals and awarded contracts. Therefore, it appears that only the pricing information in the final revised offer and awarded contract are at issue. Pricing information in the initial offer which was subsequently revised prior to the final offer and awarded contract do not appear to be at issue and may be withheld.

is purchasing the use of otherwise vacant beds. The record lacks any explanation as to why the number of beds awarded should be exempt from disclosure. As Raher suspects, the vacancy rates at the time of procurement may be an important variable to BOP. The number of beds awarded per contract goes directly to that suspicion. In addition, dividing the total price by the number of beds does not reveal the complicated pricing structure of the contract.

### 4. **Remaining Withheld Information**

BOP also has withheld large categories of other documents under Exemption 4 which do not appear to pertain to pricing information.

#### a. **Past Performance Records**

One such category are past performance records which were submitted to provide evidence that the bidder has the corporate experience to operate a secure corrections/detention facility. Schiller Decl., ¶ 41 n1. Cornell satisfied this requirement by providing entire sets of contract documents for multiple contracts, while Reeves County and GEO Group provided detailed narratives and summary sheets of prior contracts. *Id.*

The Third SVI lists subcategories of past performance records for Reeves County of Reeves County I, II, & III "Contracts," "Occurrences," "Performance Process Improvement," "Past Performance Experience," "PP&E Reeve County Contracts," "Contract Sheets R1, R2, and R3," "Reeves Past Performance History," "History and Experience," "Past Performance Information," "Current and Past Contracts," and "Experience Contract Information." Third SVI, pp. 4, 10. It lists similar subcategories for GEO Group, as well as subcategories titled "BIO," "Design Experience," "Current Contract Sheets," "Subcontractors," and "Corporate Experience." *Id*. The past performance records for Cornell, LCS, CCA, and MTC include the subcategories of

"Quality Control" and "Business Relations."  *Id*, pp. 16, 21, 26, 31.  These broad, general categories are hopelessly vague.  Moreover, they appear to look backward at a bidder's history and experience which cannot be changed by a competitor, rather than forward with information that could be used by a competitor to underbid.

Nothing in BOP's or CCA's submissions explain why Exemption 4 should protect those portions of past performance documents which are unrelated to pricing information.  GEO Group provides more detail by explaining that both its CAR Phases 5 and 6 proposals "contain multi-part past performance contract summaries," namely "first, a narrative regarding the facility; second, a detailed contract specifications document; third, a list of occurrences; and fourth, a performance/process improvement narrative."  Schiller Decl., ¶ 54.  GEO Group only seeks to exempt "several items redacted from the second part of each contract summary," specifically "the detailed year-by-year population and per diem rate charts and the 'staff complement' charts showing staffing by position title."  *Id*.  In apparent recognition of their non-confidential nature, it does not seek to exempt the other three parts (facility narrative, list of occurrences, and performance/process improvement narrative).  Although GEO Group's description is different than set forth in the Third SVI, it appears to encompass some of the past performance documents withheld by the Third SVI.  Therefore, Raher is entitled to summary judgment as to the past performance records that are narratives and lists of occurrences, whether submitted by GEO Group or other bidders, which clearly are unrelated to pricing.

GEO Group also seeks to exempt the "11 two-page contract summaries for GEO's portion of the 'Decisional Rule Criteria'" in the CAR Phase 5 proposal and "two sets of 52 single page summaries of 'Current Contracts,'" which contain "detailed capacity and per diem rate

information." *Id*.  Based on this description, these portions of past performance records do relate

to pricing and thus are potentially protected by Exemption 4.

However, GEO Group also seeks to exempt a five-page summary of its "North American

and Worldwide construction and expansion" projects in the CAR Phase 5 and 6 proposals.  *Id*,

¶ 55.  It states that release of these "significant capital investments" will "cause specific

competitive harm by allowing competitors to know when and how GEO tends to engage in those

projects." *Id*.  That statement is nothing more than an unsupported conclusion.  It is difficult to

discern how a competitor's knowledge of GEO Group's future increase in capacity would be

beneficial unless that competitor could somehow stop those plans.  In any event, an anticipated

increase in future capacity would not necessarily undercut future bidding which is dependant on

existing capacity.  Thus, the record is insufficient to exempt disclosure of such records under

Exemption 4.

### b.  Technical Proposal Records

For the other large category of withheld records, namely technical proposals, BOP lists

the following three subcategories as exempt under Exemption 4:  "Institution Operations,"

"Contract Activation," and "Physical Plant."  Third SVI, pp. 7, 13, 19, 24, 29, 34.  The first

subcategory of "Institution Operations" is variously described as containing a "detailed

description of inmate accountability techniques, emergency plans, key control, transportation,

collection and dissemination of intelligence information and security inspection systems" or

"inmate accountability techniques, and emergency plans." *Id*.  The third subcategory of

"Physical Plant" contains records which "provide details of the facility's design and location,

functional spaces, architectural plans and blue prints." *Id*.  Based on these descriptions, these

records do not contain any pricing information that would be protected by Exemption 4. However, BOP also cites Exemption 7(E) and/or 7(F) to withhold these latter two subcategories. As explained above, to the extent that these records reveal security information, they are exempt; other non-exempt information must be segregated and disclosed.

The third subcategory of "Contract Activation" is variously described as containing "human resources details on the staffing plans, blue prints of the facility, project coordinator, and training schedule for policy and procedures" or "the staffing plans, project coordinator and activation schedule."  Given GEO Group's explanation of Activation Schedules, this description by the Third SVI is odd because it clearly includes much more information than Activation Schedules.  BOP also claims Exemption 7(E) for this subcategory which makes more sense for the security information contained in the description for this subcategory, but seems to have nothing to do with Activation Schedules.

The BOP descriptions for the withheld information in the technical proposal records is even more baffling when compared to CCA's description.  According to CCA, "[i]nformation in the technical proposal records contain data regarding how the contractors will undertake the project for designing or modifying an existing procedure or creating something new, [including] methods, systems or structures to be utilized to accomplish this within a specified period of time."  Nace Decl.,  ¶ 15.  "These records demonstrate the contractor's ability to meet [*sic*] the needs of the RFP, financial competitiveness and strategies to overcome any obstacles."  *Id*.  How competitors could use such records to their competitive advantage is not further explained.  In fact, any competitive harm seems unlikely when, as Raher points out, CCA's proposal to Florida is replete with such meaningless statements as the prison "management team works to deliver a

training program which promotes integrity, consistency, and compliance with ACA Standards, CCA and applicable FDLE policy, and contract requirements." Fourth Raher Decl., Ex. Q, p. 2. Vague boilerplate descriptions of CCA's programming cannot possibly be of any use to a competitor.

Thus, as a general category, BOP has submitted insufficient evidence to satisfy its burden to justify Exemption 4 for the technical proposal records, and Raher is entitled to summary judgment to that extent.

### C. Conclusion

BOP and GEO Group have submitted sufficient evidence to create a genuine issue of fact as to whether the disclosure of pricing information is likely to cause substantial harm to the competitive position of the party from whom the information was obtained. However, it has not sustained its burden under Exemption 4 to protect: (1) evaluation and source selection decision information generated by BOP to the extent that it does not disclose pricing information obtained from the submitters; (2) records that have been previously disclosed to the public; (3) non-pricing information, including but not limited to (a) the number of beds awarded, (b) past performance records that are narratives, lists of occurrences, and planned construction or expansion projects and (c) technical proposal records.

## IV. Item 3

Although not addressed in the O&O, Raher raises another issue dating back to June 1, 2010, when this court ordered BOP to "search for and respond" to Raher's request "for all communications concerning the evaluation of awards to Reeves County, including the proposal, as well as communications between [BOP's] employees and any third parties" (docket # 44).

This order related to Item 3 of Raher's initial FOIA request which sought "[a]ny correspondence regarding the solicitation, evaluation, or issuance of" Reeves County's CAR Phases 5 and 6 contracts.

In response, BOP has produced two heavily redacted documents which are BOP's "Price Evaluation" and "Source Selection Information." Fourth Raher Decl., Ex. A. BOP produced no related correspondence and has produced no evidence indicating that it conducted an adequate search for additional Item 3 information.

When determining whether an agency has conducted an adequate search, a court must view facts in the light most favorable to the requestor. *Zemansky v. U. S. Envtl. Prot. Agency*, 767 F2d 569, 571 (9th Cir 1985). To prove that it conducted a sufficient search, an agency must "demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." *Id*, quoting *Weisberg v. U. S. Dep't of Justice*, 745 F2d 1476, 1485 (DC Cir 1984) (internal quotation marks omitted).

BOP does not explain its storage and retrieval systems, its search methods or the extent of its search. It is reasonable to assume that the correspondence responsive to Item 3 may be found in email, voicemail, phone call logs, or hard-copy correspondence files. However, the BOP employee who spent many hours conducting the search on behalf of BOP provides no information on BOP's systems for organizing email, voicemail, phone call logs, or hard-copy correspondence or her search of those systems.

By not producing evidence of a sufficient search, BOP has not complied with the Court's June 1 order requiring BOP to conduct an additional document search. Accordingly, within 14

days, BOP shall supplement the record with a detailed description of its search for all documents

responsive to Item 3.

**<u>ORDER</u>**

Accordingly, Raher's Motion for Summary Judgment (docket # 33) is GRANTED in part

and DENIED in part as set forth in this Opinion.

It is further ordered that on or before June 7, 2011, BOP shall supplement the record with

a detailed description of its search for all documents responsive to Item 3.

The court will schedule a telephone conference to set a date for an evidentiary hearing on

Exemption 4 and to resolve any other issues that may arise as a result of this Opinion.

DATED this 24th day of May, 2011.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge